HAIG P. GULEZIAN vs. LINCOLN INSURANCE COMPANY.

Essex.  December 3, 1986. — April 13, 1987.

Present: WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Insurance,* Insolvency of insurer, Liability insurance, Coverage, Construc-
tion of policy. *Contract,* Insurance. *Consumer Protection Act,* Insurance.
*Words,* "Applicable," "Collectible."

Language in an excess liability insurance policy, which created an ambiguity
as to what should happen on the insolvency of a scheduled underlying
insurer, was construed against the excess insurer so that, when the
primary insurer became insolvent during its defense of underlying tort
actions against the insured, the indemnity coverage provided by the
excess insurer dropped down to cover the consequences of the primary
insurer's insolvency. [608-612] O'CONNOR, J., dissenting.

Language in an excess liability insurance policy was clear that the excess
insurer was not required to assume the defense of certain underlying
tort actions, where the underlying policy covered the "occurrence" which
precipitated the actions, and where the coverage provided by the primary
insurer was not exhausted by the primary insurer's insolvency. [612-613]

CIVIL ACTION commenced in the Superior Court Department
on February 6, 1985.

The case was heard by *Charles M. Grabau,* J., on motions
for summary judgment.

The Supreme Judicial Court granted a request for direct
appellate review.

*Erik Lund (Laurence Field* with him) for the plaintiff.

*Stephen J. Paris (Carol A. Griffin* with him) for the defend-
ant.

WILKINS, J. This is the second of two cases we decide today
dealing with the question whether excess liability insurance
coverage drops down to replace primary coverage if a primary
insurer becomes insolvent. See *Massachusetts Insurers Insol-
vency Fund* v. *Continental Casualty Co., ante* 598 (1987).

In March, 1980, a fire in a Haverhill apartment building owned by the plaintiff caused injury and death to occupants of the building. Actions were commenced against the plaintiff, who was insured for general liability as to the apartment house to the amount of $500,000 by the Ambassador Insurance Company (Ambassador) as primary insurer and by the defendant Lincoln Insurance Company (Lincoln) to an additional amount of $1,000,000 as an excess insurer under an umbrella liability policy. Ambassador undertook the defense of the actions against the plaintiff, but, in September, 1984, Ambassador was declared insolvent and went into receivership in Vermont.[1] Lincoln declined to afford coverage within the limits of the underlying coverage or to provide a defense. In August and December, 1984, the plaintiff sent Lincoln letters purporting to be demands pursuant to G. L. c. 93A (1984 ed.). The plaintiff commenced this action in February, 1985, seeking (1) a declaration that Lincoln's umbrella policy provides both defense coverage and indemnity coverage "over and above sums collectible by the plaintiff pursuant to underlying coverage," and (2) relief pursuant to G. L. c. 93A.

Lincoln moved for summary judgment, and the plaintiff in turn sought a partial summary judgment declaring Lincoln's obligation to provide the coverage prayed for in the plaintiff's complaint. The motion judge allowed Lincoln's motion. An amended summary judgment was entered declaring that Lincoln was not obliged to defend the plaintiff in the underlying lawsuits; that Lincoln was only obliged to indemnify the plaintiff over and above $500,000, subject to policy limits; and that Lincoln's refusal to provide primary indemnity and defense coverage was not a violation of G. L. c. 93A. The plaintiff appealed. We granted Lincoln's application for direct appellate review.

---

[1] We understand that Ambassador was a nonadmitted insurance company in Massachusetts. Consequently, under G. L. c. 175D, § 1 (4) (1984 ed.), Ambassador was not an "insolvent insurer," and the Massachusetts Insurers Insolvency Fund would not stand in for Ambassador (G. L. c. 175D, § 5 [1] [*a*] [1984 ed.]), if the Lincoln coverage does not drop down.

Although we agree with the motion judge's reasoning in certain respects, we conclude that Lincoln's policy should be read to drop down to provide indemnity coverage to the extent that Ambassador's insolvent estate does not.

1. The line of contention between Lincoln and the plaintiff is clearly defined. Both parties agree that, if the Lincoln policy provides that it will drop down if the relevant primary insurance is uncollectible, Ambassador's insolvency will cause the Lincoln coverage to drop down. See *Massachusetts Insurers Insolvency Fund* v. *Continental Casualty Co., supra* at 599 n.2, and cases cited. The issue then is whether Lincoln's excess policy provides that the lower limit of its indemnity coverage will be reduced to offset the consequences of the insolvency of a primary insurer.

The Lincoln umbrella policy is not a model of precise draftsmanship. In the section defining its indemnity coverage, the policy states that it will cover "Ultimate Net Loss" (a term defined as damages for covered losses and certain related litigation expenses) in excess of "the retained limit." The retained limit is a deductible of $10,000. No mention is made in the coverage section of the consequences of any underlying insurance. That subject comes up for the first time two sections later where the policy states that Lincoln is liable only for the "Ultimate Net Loss" in excess of the greater of (a) the retained limit if no underlying insurance is applicable to the occurrence or (b) "the total of the *applicable* limits of liability of the Underlying Insurance as stated in the Schedule of Underlying Insurance and the applicable limits of any other Underlying Insurance collectible by the Insured" (emphasis supplied).[2]

---

[2] Section III in its entirety reads as follows: "UNDERLYING LIMIT — RETAINED LIMIT: The Company shall be liable only for Ultimate Net Loss resulting from any one occurrence in excess of either (a) the total of the applicable limits of liability of the Underlying Insurance as stated in the Schedule of Underlying Insurance and applicable limits of any other Underlying Insurance collectible by the Insured, less the amount, if any, by which any aggregate limit of such insurance has been reduced by payment of loss during the period of this Policy, hereinafter called the Underlying Limit, or (b) if the insurance afforded by such Underlying Insurance is inapplicable to the occurrence, the amount stated in the Declarations as the

The plaintiff makes much of the words "applicable limits," arguing that they must mean recoverable limits, and that, because the limits of the underlying Ambassador policy are not recoverable, the Lincoln coverage must drop down. If we consider solely the words quoted above, the word "applicable" refers to that underlying coverage, if any, listed in the schedule, that provides indemnity for damage claims arising out of an occurrence (i.e., accident). See *Whitney* v. *American Fidelity Co.,* 350 Mass. 542, 543-544 (1966) (no insurance was "applicable" when policy did not provide coverage for particular loss). The policy refers to the limits of the primary insurance coverage which the insured agrees to maintain.[3] This is the view expressed by the motion judge. It is supported by case authority. See *Continental Marble & Granite* v. *Canal Ins. Co.,* 785 F.2d 1258, 1259 (5th Cir. 1986); *Molina* v. *United States Fire Ins. Co.,* 574 F.2d 1176, 1178 (4th Cir. 1978). We agree with the conclusion that the words "applicable limits" are not ambiguous, viewing those words in isolation in the first sentence of section I of the policy. We shall return to the question whether, in the context of the entire policy, the words "applicable limits" have another meaning.

The plaintiff relies further on the provision in section III that makes the Lincoln policy excess of the limits of applicable coverage stated in the schedule of underlying insurance and "the applicable limits of *any other* Underlying *Insurance collectible* by the Insured" (emphasis supplied).[4] Here the plain-

---

Retained Limit, whichever is greater. The limits of liability of any Underlying Insurance Policy shall be deemed applicable irrespective of any defense which the underlying insurer may assert because of the insured's failure to comply with any condition of the Policy subsequent to an occurrence."

[3] Paragraph 14 of the Conditions of the policy states in part: "14. Maintenance of Underlying Insurance: Each Policy described in the Schedule of Underlying Insurance shall be maintained in full effect during the currency of this Policy except for any reduction of the aggregate limits contained therein solely by payment of claims arising out of occurrences taking place during the period of this Policy. Failure of the Named Insured to comply with the foregoing shall not invalidate this Policy but in the event of such failure the Company shall be liable only to the extent that it would have been liable had the Named Insured complied therewith."

[4] Although words are capitalized, the policy does not define "Underlying Insurance."

tiff's claim is that, if "other" applicable insurance must be "collectible," the scheduled primary insurance also must be "collectible." The insurance company's purpose in inserting this language concerning other insurance collectible by the insured was, no doubt, to make its coverage excess of any first dollar insurance not listed in the schedule which becomes available in the circumstances of any accident causing a covered loss. If the Lincoln policy had said "any other collectible insurance," the argument that the underlying scheduled coverage must also be "collectible" would be stronger. Even as written, however, courts have read substantially similar language to mean that the underlying scheduled insurance as well as any other insurance must be collectible.[5] Although the conclusion that in context the word "collectible" applies to the underlying scheduled insurance is debatable (see *Poirrier* v. *Cajun Insulation, Inc.,* 501 So. 2d 800, 809 (La. Ct. App. 1986] [Byrnes, J., dissenting in part]), we need not decide the point. Other language in the policy creates an ambiguity as to whether the excess coverage drops down when the underlying insurance is not collectible. That ambiguity should be resolved in favor of the insured. See *Cody* v. *Connecticut Gen. Life Ins. Co.,* 387 Mass. 142, 146 (1982); *Slater* v. *United States Fidelity & Guar. Co.,* 379 Mass. 801, 804 (1980); *MacArthur* v. *Massachusetts Hosp. Serv., Inc.,* 343 Mass. 670, 672 (1962); *August A. Busch & Co. of Mass., Inc.* v. *Liberty Mut. Ins. Co.,* 339 Mass. 239, 243 (1959).

Earlier in this opinion we indicated that the reference in a portion of the policy to the "applicable limits" of the underlying

---

[5] See *Poirrier* v. *Cajun Insulation, Inc.,* 501 So. 2d 300 (La. Ct. App. 1986) (four-to-one decision) (under policy language stating the excess coverage to be above "an amount equal to the limits of liability indicated beside the underlying insurance listed in Schedule A hereof, plus the applicable limits of any other underlying insurance collectible by the Insured," excess coverage drops down upon insolvency of primary insurer because all the primary insurance referred to in the clause must be collectible). Cf. *Geerdes* v. *St. Paul Fire & Marine Ins. Co.,* 128 Mich App. 730, 734 (1983) (construing similar language, where the issue was somewhat different, the court said that the only policies listed in the schedule "that are considered in the computation are those that are collectible by the insured").

coverage referred to any underlying policy that was relevant in relation to the particular kind of damage claim asserted (automobile, general liability, etc.). The policy uses the word "applicable" in the same section in another sense, one that tends to equate "applicable" with "collectible." The last sentence of section III, quoted in n.2 above, provides that, if the benefit of underlying insurance is unavailable because of the insured's failure to comply with a postoccurrence policy condition (such as cooperation with its insurer), the underlying insurance policy "shall be deemed applicable" and the excess coverage will not drop down. If the word "applicable" had only the precise, restricted meaning we attributed to it earlier in this opinion, this sentence would be unnecessary. This sentence opens up the thought that applicability can be determined by postoccurrence events, including the uncollectibility of the primary insurance. The insured is told that, if the primary insurance is not collectible because of his fault, the excess insurance will not drop down. The insured is not told, however, that the policy will not drop down if the primary insurance is not collectible through no fault of the insured, such as the postoccurrence insolvency of the primary insurer.

The seeming uncertainty whether the policy drops down if the underlying insurance is uncollectible through no fault of the insured is augmented by paragraph nine of the Conditions. "The insurance afforded by this Policy shall be excess insurance over any other valid and *collectible* insurance available to the Insured *whether or not described in the Schedule of Underlying Insurance* . . . and applicable to any part of Ultimate Net Loss . . . ." (emphasis supplied). The implication is that Lincoln's coverage is excess only of collectible insurance, including the primary insurance listed in the schedule of underlying insurance.

If to this point an eyebrow is not raised to the level which marks a discernible policy ambiguity, the language of paragraph seven of the conditions provides the necessary impetus. That section says that "[t]he company's liability . . . shall not attach until the amount of the *applicable* Underlying Limit has been paid by or on behalf of the Insured . . . ." (emphasis

supplied). If "applicable Underlying Limit" in this section does not mean "recoverable" or "collectible" limits, an insured would obtain no benefit from his excess coverage upon the insolvency of his primary insurer if he could not himself provide the funds necessary to pay claims equal to the primary insurer's deficiency. If, however, "the applicable Underlying Limit" means the recoverable or collectible underlying limit, the suggested unconscionable policy interpretation is avoided.

It seems likely that Lincoln did not contemplate the insolvency of a scheduled underlying insurer in drafting its policy. The phenomenon of the insolvency of an insurer is not, however, so rare as to excuse that omission of attention to detail. The result is that Lincoln issued a policy in which it generated uncertainty as to what should happen on the insolvency of a primary insurer. On traditional analysis (see *Cody* v. *Connecticut Gen. Life Ins. Co.*, 387 Mass. 142, 146 [1982]), the ambiguity must be construed against Lincoln.[6] The Lincoln indemnity coverage drops down to cover the consequences of Ambassador's involvency.[7]

2. The excess policy is clear that Lincoln is not required to assume the defense of the underlying tort actions. Section II provides, as the plaintiff concedes, that Lincoln need not defend suits if the occurrence is covered by an underlying policy listed in the schedule of underlying insurance. An underlying policy covered the occurrence in this case.

Paragraph 16 of the Conditions says that "if the Underlying Insurance is exhausted by any occurrence," Lincoln must assume the defense. The Ambassador coverage was not exhausted by any occurrence, as defined in the policy ("an accident," etc.). Cf. *Massachusetts Insurance Insolvency Fund* v. *Continental Casualty Co., supra* at 601 (insolvency can cause coverage to be reduced).

---

[6] We need not apply the concept of an insured's objectively reasonable expectations in reading this policy. See *Massachusetts Insurers Insolvency Fund* v. *Contintental Casualty Co., supra* at 600 n.4.

[7] Lincoln's obligation might not become first dollar coverage. If Ambassador's involvent estate can pay something to its general creditors, any amount available from the insolvent estate will underlie the Lincoln coverage.

In light of what we have just held concerning Lincoln's indemnity obligations, however, Lincoln may prefer to assume control of the defense of the underlying tort claims. Although Lincoln does not have to assume the defense of the underlying claims, the plaintiff's litigation expenses as described in the policy are part of the "Ultimate Net Loss" and Lincoln will have to reimburse the plaintiff for them in the same way it must indemnify the plaintiff for indemnity losses.

3. The plaintiff did not seek summary judgment concerning its G. L. c. 93A claim. We do not have the factual background for the plaintiff's G. L. c. 93A claim, and we cannot and should not decide it. An insurance company which in good faith denies a claim of coverage on the basis of a plausible interpretation of its insurance policy is unlikely to have committed a violation of G. L. c. 93A. See *Van Dyke* v. *St. Paul Fire & Marine Ins. Co.,* 388 Mass. 671, 675-678 (1983).

4. The judgment is vacated. A new partial summary judgment shall be entered declaring that (1) the Lincoln Insurance Company umbrella policy provides indemnity coverage with respect to all losses covered by that policy over and above sums collectible by the plaintiff pursuant to the underlying coverage, and (2) unless the parties now agree otherwise, Lincoln Insurance Company is not obliged to assume the defense of the underlying tort claims against the insured.

*So ordered.*

O'CONNOR, J. (dissenting). To the extent relevant here, Lincoln's obligation is set forth in Insuring Agreement III, which says: "UNDERLYING LIMIT — RETAINED LIMIT: The Company shall be liable only for Ultimate Net Loss [damages for covered losses and litigation expenses] resulting from any one occurrence in excess of either (a) the total of the applicable limits of liability of the Underlying Insurance as stated in the Schedule of Underlying Insurance and the applicable limits of any other Underlying Insurance collectible by the Insured, less the amount, if any, by which any aggregate

limit of such insurance has been reduced by payment of loss during the period of this Policy, hereinafter called the Underlying Limit, or (b) if the insurance afforded by such Underlying Insurance is inapplicable to the occurrence, the amount stated in the Declarations as the Retained Limit, whichever is greater. The limits of liability of any Underlying Insurance Policy shall be deemed applicable irrespective of any defense which the underlying insurer may assert because of the insured's failure to comply with any condition of the Policy subsequent to an occurrence."

The word "applicable" in III (a), modifying the words "limits of liability of the Underlying Insurance as stated in the Schedule of Underlying Insurance," clearly means the limits of liability stated in any underlying policy that (1) covers the occurrence in question, and (2) is listed on the schedule. The court agrees that that language, viewed "in isolation," has the clear meaning I attribute to it. *Ante* at 609. Nevertheless, the court concludes that in the last sentence of III the words "applicable limits of liability" tend to mean "collectible limits of liability," and that, therefore, those words elsewhere in III are ambiguous and should be construed favorably to the insured as meaning "collectible limits of liability." *Ante* at 609-612. In my view, however, the word "applicable" wherever it appears in Insuring Agreement III, including the last sentence, cannot reasonably be construed to mean "collectible".

Insurance proceeds, being money, are collectible. The word "insurance," in a suitable context, may be construed to mean "insurance proceeds," and therefore be collectible. But, limits of liability cannot be gathered or received as can money. Therefore, according to the usual usage of our language, limits of liability are not collectible. Courts should not conclude that policy language fairly susceptible of interpretation in the usual and ordinary sense has instead been used in an unusual and inappropriate way. *Manning* v. *Fireman's Fund Am. Ins. Co.*, 397 Mass. 38, 40 (1986). *Barnstable County Mut. Fire Ins. Co.* v. *Lally,* 374 Mass. 602, 605 (1978).

Furthermore, interpreting the words applicable "limits of liability of any Underlying Insurance Policy" as referring to

the stated limits of liability of relevant policies listed on the schedule furthers the obvious purpose of the sentence, and is consistent with the policy as a whole. That provision simply says that any listed underlying policy that would cover the insured's loss in the absence of the insured's material breach of his obligations shall be deemed to cover the loss regardless of defenses the underlying insurer may have on account of such breaches. The reason for such a provision is no mystery. The burden created by the insured's failure to secure the primary carrier's liability is not to be shifted from the insured to Lincoln.

The court says that the last sentence of Insuring Agreement III tells the insured that "if the primary insurance is not collectible because of his fault, the excess insurance will not drop down." *Ante* at 611. The court then concludes that an insured could reasonably infer that if the primary insurance is not collectible through no fault of the insured, such as the primary insurer's insolvency, the excess insurance will drop down. But, the last sentence of Insuring Agreement III only tells the insured that if the primary insurer is not *liable* because of the insured's fault, the excess insurance will not drop down. That message in no way suggests that, if the primary insurance is uncollectible by reason of insolvency, the excess insurance will drop down.

Paragraph 7 of the Conditions, of which Paragraph 9 is but a logical extension, provides that "[t]he company's liability under this Policy with respect to any occurrence shall not attach until the amount of the applicable Underlying Limit has been paid by or on behalf of the Insured or the amount of the Retained Limit has been paid by the Insured on account of such occurrence." The court observes, *ante* at 612, that, if the word "applicable" in that provision does not mean collectible, "an insured would obtain no benefit from his excess coverage upon the insolvency of his primary insurer if he could not himself provide the funds necessary to pay claims equal to the primary insurer's deficiency." Concluding that such a result would be "unconscionable," the court finds comfort in avoiding it by considering the word "applicable" as ambiguous and then construing it to mean "collectible."

If the policy were ambiguous, considerations of conscionability of competing possible interpretations might be relevant. But neither Condition 7 nor the policy as a whole are ambiguous. Therefore, there is no occasion for the court to consider the conscionability of Condition 7. Furthermore, a provision requiring that the amount of the underlying insurance actually be paid by or on behalf of the insured before the excess insurer's liability will attach is not unconscionable. It simply promotes the purpose of *excess* coverage. If, instead of having an excess policy with a limit of $1,000,000, as here, the insured had had underlying coverage with Ambassador with a $1,000,000 limit, the insured's collectible insurance would have been zero because of Ambassador's insolvency. A commitment on behalf of Lincoln effectively to substitute itself for Ambassador as to the excess and to pay the excess only if Ambassador pays up to its limit, or until the insured pays that amount, is not unconscionable.

The court rightly concludes that Lincoln is not required to assume the defense of the underlying tort actions. The message from that is that Lincoln's coverage is not first dollar coverage. If Lincoln has no obligation to defend, it also appears that it has no right to defend. The court observes that, in light of the position in which the court's holding puts Lincoln, Lincoln "may prefer to assume control of the defense of the underlying tort claims." *Ante* at 613. But what is the source of Lincoln's right to do so? It appears that the party required to pay the tort judgments will have no right of control over the proceedings from which those judgments may result. The court's resolution of the indemnity and defense issues presented by this case, therefore, is inconsistent. I would affirm the judgment below.