**Scott PECKHAM and Jo Anne Peckham, Plaintiffs,**

v.

**CONTINENTAL CASUALTY INSURANCE COMPANY, Defendant.**

**No. CIV. A. 87–2611–H.**

United States District Court, D. Massachusetts.

Feb. 28, 1989.

Philip N. Beauregard, Beauregard & Burke, New Bedford, MA, for Plaintiffs.

Thomas D. Burns, Burns & Levinson, Boston, MA, for Defendant.

## MEMORANDUM

HARRINGTON, District Judge.

Plaintiffs Scott Peckham ("Mr. Peckham") and his wife Jo Anne Peckham ("Mrs. Peckham"), as assignees of Andrew Tripp ("Tripp"), the insured of Continental Casualty Company ("CNA"),[1] allege that CNA engaged in unfair and deceptive acts or practices in violation of Mass.Gen.L. ch. 93A ("ch. 93A"). Two other counts of alleged breach of duty to settle the third party claims of Mr. Peckham and Mrs. Peckham in good faith were tried to a jury resulting in a verdict for the defendant CNA.[2] The ch. 93A count was tried to the bench and this opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

Plaintiffs allege five grounds for relief under ch. 93A:

(1) CNA breached its contract with Tripp by failing to respond to settlement offers in good faith and that CNA's lack of good faith violated ch. 93A;

(2) CNA failed to settle Mr. Peckham's claim against Tripp when Tripp's liability became reasonably clear in violation of Mass. Gen.L. ch. 176D, § 3(9)(f); willfully and/or knowingly "fail[ed] to settle claims promptly, where liability became reasonably clear, under one portion of the insurance policy coverage in order to influence settlement under other portions of the insurance coverage" in violation of ch. 176D, § 3(9)(m); and willfully and/or knowingly "fail[ed] to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement" in violation of ch. 176D, § 3(9)(n) and that these violations of ch. 176 constitute per se violations of ch. 93A;[3]

(3) CNA failed to advise Tripp of his right to appeal the jury verdict in the underlying tort case;

(4) CNA's staff counsel breached the attorney-client relationship it owed to Tripp and that this breach was a violation of ch. 93A;

(5) CNA refused to offer relief (payment of the excess judgment) upon demand when CNA had knowledge and reason to know that the act or practices complained of violated ch. 93A, § 2 and by willfully or knowingly employing acts or practices prohibited under ch. 93A, § 9. Plaintiffs seek multiple damages for these alleged violations; and

(6) CNA failed to inform Tripp of settlement offers and of the pendency and implica-

---

1. Tripp's automobile liability policy issued by CNA afforded the statutory minimum coverage of: (a) bodily injury liability $20,000 per accident; (b) underinsured motorist coverage in the amount of $10,000 per person/$20,000 per accident; (c) $5,000 for medical payments; and (4) $2,000 for personal injury protection.

2. The jury found that the defendant CNA acted in bad faith between August 3, 1983 and July 17,

1984 and that CNA did not act in bad faith between July 17, 1984 and March 26, 1987, the date of trial in the case of *Peckham v. Tripp* in Bristol County Superior Court. The jury found no causal connection between CNA's bad faith and the insured Tripp's alleged damages.

3. The plaintiffs agreed to a directed verdict being entered against them on this claim.

tions of *Bilodeau v. Lumbermens Mutual Casualty Co.*, 392 Mass. 537, 467 N.E.2d 137 (1984). *See infra.*

### I. *Background*

Mr. Tripp was the defendant in an underlying tort action brought by Mr. Peckham, a quadriplegic, for personal injuries suffered while a passenger in a motor vehicle driven by Tripp which crashed into a tree. Mrs. Peckham brought a separate action against Tripp for her loss of consortium.

After a jury trial in March, 1987, in Bristol County Superior Court, a verdict was returned against Tripp for Mr. Peckham for $3,000,000 and for Mrs. Peckham for $75,000.

After the personal injury trial Tripp assigned whatever rights he might have against his insurer to the Peckhams for any alleged bad faith by the insurer in failing to settle the Peckhams' claims, in consideration for the Peckhams' forbearance in seeking satisfaction for their judgments from Tripp. (Exhibit 1).[4]

Mr. and Mrs. Peckham allege that CNA acted in bad faith toward Tripp in failing to settle their two claims in the underlying tort action.

The instant case involves two stages in which CNA allegedly failed to settle in good faith the Peckhams' claims against its insured Tripp. The first stage involves the failure to settle Mr. Peckham's claim for $27,000, the full payment under the "per person" limits of Tripp's policy, without conditioning its settlement offer with a demand that Mrs. Peckham release her claim for loss of consortium. Stage one runs from the date of the accident on August 3, 1983, to July 17, 1984, the date of the Supreme Judicial Court's decision in *Bilodeau v. Lumbermens Mutual Casualty Co.*, 392 Mass. 537, 467 N.E.2d 137 (1984) (hereinafter *"Bilodeau"*). *Bilodeau* held that the loss of consortium claim was included under the "per accident" limits of the insured's automobile liability policy.

The second stage involves the failure of CNA to accept the Peckhams' proposal of

September, 1984, to settle the case for $47,000, full payment under the "per accident" limits of Tripp's policy, in exchange for Tripp being held harmless by the Peckhams. A jury trial would then have been held in Mr. Peckham's personal injury action and Mrs. Peckham's loss of consortium action against Tripp to determine damages for a prospective "bad faith" settlement case against CNA. This stage relates to the period from the *Bilodeau* decision on July 17, 1984, to commencement of the *Peckham v. Tripp* tort action in March, 1987. In response to the Peckhams' proposal, CNA was willing to pay $47,000 to have Tripp held harmless, but sought to have any damages in a prospective "bad faith" settlement suit determined in the "bad faith" suit itself without the necessity for the separate tort action against Tripp to determine damages.

### II. *Finding of Fact*

I find that the Peckhams' attorney, Brian Corey ("Corey"), first spoke to Eileen Nolan ("Nolan") (now known by her married name, Kelley), the Senior Claim Representative handling the matter for CNA, in late October, 1983. Corey advised that he was seeking payment on two claims: Mr. Peckham's claim for bodily injury and Mrs. Peckham's claim for loss of consortium. Nolan responded that CNA was willing to make a "full policy" settlement.

On November 4, 1983, (Exhibit 5), Nolan wrote Corey offering what she believed to be the full policy limits to settle this claim.

At the end of November or the beginning of December, 1983, Corey spoke with Nolan regarding $20,000 he sought for Mrs. Peckham's loss of consortium claim. Nolan said that the loss of consortium claim was not covered as a separate claim under the "per accident" limits, but was covered only under the "per person" limits of the policy. Therefore CNA offered to pay the "per person" limits of $27,000 in exchange for a husband-wife release. Corey told Nolan that even if the loss of consortium claim was not covered as a separate claim under the "per accident"

---

4. The exhibits referenced in this Memorandum were admitted in the jury trial and are part of the

record in the plaintiffs' claim under ch. 93A.

limits, Mrs. Peckham still had a separate liability claim against Tripp for loss of consortium.

On February 15, 1984, (Exhibit 7), Corey wrote Nolan and stated that he was willing to settle Mr. Peckham's claim for $27,000 independent of Mrs. Peckham's claim or to settle both claims for $47,000. Receiving no reply to this letter, Corey contacted Nolan and reiterated that he was willing to settle Mr. Peckham's claim alone for $27,000.

On or about March 12, 1984, Corey called Nolan and during this conversation Nolan said that she had consulted an attorney[5] and that there was a case pending before the Supreme Judicial Court which would decide whether the loss of consortium claim was covered under the "per person" or "per accident" limits of the policy. Nolan then told Corey she was sending him settlement papers that he would be "happy with."

On or about March 23, 1984, Corey received the proposed settlement agreement in which CNA offered to pay Mr. Peckham's claim for $27,000 and to pay Mrs. Peckham's claim for $20,000, only if the pending *Bilodeau* decision held that the loss of consortium claim was covered by the "per accident" limits of the policy, in exchange for a husband-wife release.

On April 19, 1984, Corey, without responding to CNA's proposed settlement, filed suit on behalf of the Peckhams against Tripp in Bristol County Superior Court.

On May 1, 1984, Nolan called Corey and asked if she was "going to get the document?" Corey responded that she would not, but that she would be getting his response, if she had not already received it. At this time CNA did not know that the Peckhams had filed suit against Tripp.

On May 30, 1984, Attorney Christine Cooney ("Cooney"), staff counsel for CNA, advised Corey that she had just been assigned the *Tripp* case and had learned that Tripp was already in default for failure to file an Answer to the Complaint. Corey advised Cooney that his previous offer was no longer open and that he was now seeking a reason-

able offer in excess of policy limits because of a potential "bad faith" claim.

On June 6, 1984, a hearing was held in the Bristol County Superior Court on Tripp's Motion for Removal of Default. The Peckhams opposed the motion. The court allowed removal of the default. Corey at this court appearance told Cooney, again, that his offer was no longer open and that he believed he had a potential "bad faith" claim, to which Cooney disagreed.

On May 30, 1984, CNA's staff counsel Christine Cooney wrote a memo to Eileen Nolan, the CNA claims representative assigned to the claims against Tripp. (Exhibit 12). Cooney wrote that:

> ... we have a duty to keep our insured informed of any offers of settlement which the Plaintiff puts forward. In that regard it is of the utmost importance that the insured be informed of the Plaintiff's offer to release the insured from liability on the claims of the husband in exchange for the amount of $27,000 which is available under the policy. The insured may feel that it is in his best interest to be released from liability on the husband's claims, even though this would use up all of his insurance coverage. (Certainly the wife's claim for loss of consortium, though substantial, is less *serious* than the Plaintiff husband's claim.) In any event we should be certain that this offer is communicated to the insured and that he makes the decision as to whether he wishes to exhaust the available coverage in this manner.
>
> ...
>
> It is of the utmost importance that we communicate all offers of settlement to the insured. In addition to offering to settle the husband's claim for $27,000 the Plaintiff's attorney is offering to settle both the husband's and wife's claims for the total amount of $47,000. This offer of settlement should be communicated to the Defendant who may wish to pay the additional $20,000 out of his own pocket. This option should be communicated to the insured, so that he can make his decision with regard to it.

5. Attorney Stephen Paris of the Boston law firm of Morrison, Mahoney and Miller.

On June 18, 1984, Kenneth Roberts ("Roberts"), a CNA claims representative, traveled to New Bedford, Massachusetts, to meet with Tripp and to explain the lawsuit filed by the Peckhams against him. (Exhibit P). At this meeting Roberts asked Tripp whether he wished CNA to attempt to settle Mr. Peckham's claim for $27,000. I find that Roberts did not inform Tripp that Mrs. Peckham had offered to settle her claim for $20,000. On September 1, 1983, within a month of the accident, CNA had interviewed Tripp by telephone concerning his memory of the accident. CNA unsuccessfully tried to contact Tripp again during September of 1983. I find that between October of 1983 and May 22, 1984 (Exhibit T) [6] CNA did not attempt to contact Tripp and that June 18, 1984 was the first time Tripp was asked whether he desired CNA to attempt to settle Mr. Peckham's claim for $27,000.

On July 10, 1984, Roberts again met with Tripp in New Bedford. (Exhibit R). Roberts delivered to Tripp a letter dated June 29, 1984, signed by Nolan and drafted by Cooney explaining coverage available and asking Tripp whether he wished CNA to attempt to settle Mr. Peckham's claim for $27,000, the full amount of his coverage. (Exhibit 13).[7] Again I find that Roberts did not mention Mrs. Peckham's settlement offer. On both June 18 and July 10, 1984 Tripp refused to sign a document which would have authorized the settlement of Mr. Peckham's claim for $27,000 without his first talking to his attorney.

I find that CNA did not inform Tripp before July 17, 1984 of the pendency of *Bilodeau* before the Supreme Judicial Court and that CNA did not explain to Tripp before that date that he might have an additional $20,000 in coverage if *Bilodeau* were to hold that loss of consortium was a separate injury entitled to coverage under the "per accident" aggregate. I further find that before July 17, 1984, CNA did not inform Tripp that he could have unconditionally settled Mr. Peckham's claim for $27,000 and Mrs. Peckham's claim for $20,000 or Mr. Peckham's claim alone for $27,000. These offers had been open at least between early December of 1983 and March 15, 1984. CNA's failure to provide Tripp with this information prevented him from considering the option of settling Mr. Peckham's claim for $27,000 and Mrs. Peckham's claim for $20,000, for Mrs. Peckham's claim he would have been personally liable, or of settling Mr. Peckham's claim alone for $27,000, with an understanding that, depending on the outcome of *Bilodeau,* Tripp would either be personally liable for Mrs. Peckham's damages or CNA would be obligated to reimburse Tripp $20,000 for having paid Mrs. Peckham's claim. I find, however, that the Peckhams' offers to settle were retracted no later than April 19, 1984. Finally, I find that CNA did not inform Tripp that Attorney Cooney had drafted the June 29, 1984 coverage letter. (Exhibit 13).

On July 17, 1984, the Supreme Judicial Court held in *Bilodeau v. Lumbermens Mutual Casualty Co.* that a loss of consortium claim was covered under the "per accident" limits. On July 31, 1984, Nolan wrote Corey that CNA would now settle both claims for "full coverage" in the amount of $47,000 in exchange for a husband-wife release. Corey rejected this offer in a letter dated August 7, 1984. (Exhibit 22).

---

6. On May 22, 1984 Nolan wrote Tripp acknowledging CNA's receipt from him of the Summons and Complaint served on him in the underlying tort case. The letter pointed out that the suit was in the amount of $11,000,000, well in excess of the per person bodily injury limit of the policy. No mention was made of prior settlement offers or the pendency and implications of *Bilodeau.*

7. The letter drafted by Cooney advised Tripp that, since his accident involved bodily injury to one person, he had coverage in the amount of $27,000, but because of the seriousness of Mr. Peckham's injuries, it was likely that any judgment against him would be greatly in excess of the full coverage available. This letter also referred to the May 22, 1984 letter which had explained that damages sought by Mr. Peckham and Mrs. Peckham exceeded the amount of his coverage. This letter advised Tripp that he would be personally liable for any excess judgment. The letter also requested that Tripp inform CNA if he wished it to settle Mr. Peckham's claim alone by offering full coverage in the amount of $27,000, but advised him that he would still be liable for Mrs. Peckham's claim without any coverage being available. Tripp was urged to consult an attorney. No mention was made of the pendency and implications of *Bilodeau.*

In late August, 1984, Corey was informed by Attorney Stephen Paris of the Boston law firm of Morrison, Mahoney and Miller that the firm would be representing CNA.

On September 19, 1984, (Exhibit 9), Corey submitted his new proposal to CNA; Paris submitted a counterproposal in November, 1984. (Exhibit 10).[8]

In July, 1986, after a conversation with Tripp's trial attorney, Timothy Sterritt ("Sterritt"), Corey renewed his September 19, 1984 proposal. (Exhibit 23).

On August 7, 1986, CNA referred Corey's proposal to Tripp and advised Tripp to seek the advice of independent legal counsel. (Exhibit 24).

In August or September, 1986, Attorney Sterritt told Corey that CNA had no interest in his proposal. In October, 1986, Attorney Paris also conveyed CNA's lack of interest in accepting Corey's proposal.

On March 26, 1987, the case of the *Peckham v. Tripp* went to trial. The jury returned verdicts of $3,000,000 for Mr. Peckham and $75,000 for Mrs. Peckham.

Andrew Tripp assigned his rights against the Insurance Company to the Peckhams on May 18, 1987.

On June 22, 1987, Corey drafted his ch. 93A Demand Letter, which in pertinent part to this proceeding, claims, on behalf of both Peckhams, as assignees of Andrew Tripp, that CNA engaged in an unfair and deceptive act or practice in failing to settle the claims of Mr. and Mrs. Peckham against CNA's insured, Tripp.

### III. *Conclusions of Law*

### A. *Breach of Contract*

#### (1) *Stage I*

The Massachusetts Automobile Insurance Policy ("Policy") (Exhibit 3) is the contract between the defendant CNA and the insured Andrew Tripp. The policy provides:

We have the right and duty to defend any lawsuit brought against anyone covered under this policy for damages which might be payable under this policy. We will defend the lawsuit even if it is without merit. We have the right to settle any claim or lawsuit as we see fit. Our duty to settle or defend ends when we have paid the maximum limits of coverage under this policy. If any person covered under this policy settles a claim without our consent, we will not be bound by that settlement.

The policy left the decision whether to settle within the policy limits entirely to CNA's discretion. Such a clause in the policy creates both an obligation and a privilege on the part of the insurer. *Abrams v. Factory Mut. Liability Ins. Co.*, 298 Mass. 141, 145, 10 N.E.2d 82 (1937).

 CNA must make settlement decisions in good faith or be in breach of contract. *Murach v. Mass. Bonding and Ins. Co.*, 339 Mass. 184, 158 N.E.2d 338 (1959). Good faith by the insurer requires that it make the decision whether to settle a claim within the limits of the policy as it would if no policy limit was applicable to the claim. *Id.* at 187, 158 N.E.2d 338. The insurer's obligation to the insured is to act in good faith to protect the insured from an excess judgment. For the insurer to be liable to an insured "something more must be shown than [its] failing to make a settlement which a reasonably prudent person exercising due care 'from the standpoint of the assured' would have made." *Id.* (quoting *Abrams*, 298 Mass. 141, 145, 10 N.E.2d 82). CNA was concerned that if it settled Mr. Peckham's claim for $27,000, without obtaining a husband-wife release, its insured Tripp would be exposed to Mrs. Peckham's potential substantial loss of consortium claim.[9] CNA argues that the reason it did not settle Mr. Peckham's claim, without first obtaining a release of Mrs. Peckham's claim, was to protect its insured. The Peckhams argue that this decision was part of a settlement policy

---

8. Both proposals are summarized, *supra*, at 5. These proposals constitute the evidence of whether CNA failed to settle in good faith during what plaintiffs refer to as stage two of its bad faith claim.

9. One of CNA's expert witnesses, Mr. James Meehan, an experienced trial lawyer, testified that Mrs. Peckham's loss of consortium claim exposed Tripp to as much potential damages as did Mr. Peckham's bodily injury claim.

to spare CNA from paying spousal consortium claims and from having to undertake the defense of such claims.

An insurance company's settlement decisions must give at least equal consideration to the interest of the insured as it gives to its own interests. *Liberty Mutual Insurance Co. v. Davis*, 412 F.2d 475, 483 (5th Cir.1969). I find that CNA refused to settle Mr. Peckham's claim for $27,000, without first obtaining a husband-wife release, primarily to protect Tripp against a potential multi-million dollar loss of consortium claim by Mrs. Peckham.

Between December 7, 1983, and March 23, 1984, CNA could have settled Mr. Peckham's claim for $27,000 and Mrs. Peckham's claim for $20,000. CNA believed, however, that its insured had only $27,000 in coverage. On July 17, 1984, the Supreme Judicial Court held in *Bilodeau v. Lumbermens Mutual Casualty Co., supra*, that an individual with a loss of consortium claim was to be treated as a person separate from the bodily-injured person for the purpose of applying the policy limitations of liability and thus entitled to an independent "per person" recovery within the "per accident" limit of the policy. Therefore, applying the holding of *Bilodeau* to the Peckhams' claim, there was $47,000 available in coverage. Plaintiffs' attorney's interpretation of coverage was correct; CNA's interpretation was mistaken.

■ A mistake in judgment, alone, is not bad faith. The insurance company is not required to predict the future course of the law. *See Steele v. Hartford Fire Ins. Co.*, 788 F.2d 441, 447 (7th Cir.1986). The question of whether the duty of good faith was fulfilled must be judged at the time the duty was being exercised, on the basis of what the defendant knew at that time. *See Davis*, 412 F.2d at 483. I find that CNA, and the insurance industry as a whole, believed that the Massachusetts Automobile Insurance Policy included loss of consortium as part of the "per person" limit and thus not as a separate injury necessary for coverage in the "per accident" aggregate. This finding is substantiated by the Commissioner of Insurance's decision after *Bilodeau* to change the standard form of compulsory private passenger automobile insurance to reduce coverage for loss of consortium claims. *See generally, Liberty Mutual Ins. Co. v. Commissioner of Insurance*, 395 Mass. 765, 767, 481 N.E.2d 1373 (1985).

■ Although a belief in non-coverage does not, alone, justify an insurer's rejection of a reasonable settlement offer, *see Buntin v. Continental Ins. Co.*, 525 F.Supp. 1077, 1084 (D.Vi.1981); *cf. DiMarzo v. American Mutual Ins. Co.*, 389 Mass. 85, 96–97, 449 N.E.2d 1189 (1983) (rejecting the proposition that an act or practice authorized by statute cannot constitute an unfair or deceptive practice under ch. 93A), "[a]n insurance company which in good faith denies a claim of coverage on the basis of a plausible interpretation of its insurance policy is unlikely to have committed a violation of G.L. c. 93A." *Gulezian v. Lincoln Ins. Co.*, 399 Mass. 606, 613, 506 N.E.2d 123 (1987) (citing *Van Dyke v. St. Paul Fire & Marine Ins. Co.*, 388 Mass. 671, 675–678, 448 N.E.2d 357 (1983)). I find that CNA's interpretation of coverage for loss of consortium prior to *Bilodeau* was a plausible interpretation of the policy made in good faith.

■ CNA had contacted Attorney Stephen Paris of the Boston law firm of Morrison, Mahoney and Miller for an interpretation and evaluation of its coverage obligations. When an insurer reasonably relies on a diligent, good faith evaluation by its counsel, such reliance is evidence of the insurer's good faith. *See Bohemia v. Home Ins. Co.*, 725 F.2d 506, 513 (9th Cir.1984); *cf. Gorman v. Southeastern Fidelity Ins. Co.*, 775 F.2d 655, 659 (5th Cir.1985) (good faith reliance upon advise of counsel may prevent imposition of punitive damages). I find that CNA relied on the evaluation of counsel in making its settlement decision in the instant case and I consider such reliance evidence of CNA's good faith.

Even if CNA was in good faith in its belief that its insured Tripp only had $27,000 in coverage, the question remains whether CNA should have settled Mr. Peckham's multi-million dollar personal injury claim for $27,000, without insisting on a husband-wife release from Mrs. Peckham. In *Liberty Mu-*

tual Ins. Co. v. Davis, 412 F.2d 475 (5th Cir.1969), the court discussed the obligation of an insurance company when multiple claims against an insolvent insured exceed the limits of his policy. In *Davis,* the court held that insurers may settle one or more asserted claims prior to judgment, even though coverage limits are exhausted. *Id.* at 480; *cf. Bruyette v. Sandini,* 291 Mass. 373, 197 N.E. 29 (1935) (insurer has a right to settle with only one of multiple claimants). When two individuals assert claims against an insured and liability is clear, the insurer should try to settle third party claims against the injured so as to relieve the insured of as much of his potential liability as possible. *Davis,* 412 F.2d at 481. If the insured's coverage is slight compared to the total of the injured persons' claims, as to make settlement of all injured persons' claims within the policy limits impossible, insistence upon settling all the claims might not benefit the insured. The insured might be better protected if the leverage of his coverage is applied to at least some of the claims so as to reduce his ultimate judgment debt. *Id.* at 481.

On the other hand, if the insured's coverage is needlessly exhausted on one claim, when coverage might cancel out other claims as well, the insured may suffer from its insurer's readiness to settle. The insured coverage limits should not be exhausted without an attempt to settle as many claims as possible. The insurer has the right to exercise its own judgment in resolving these competing concerns provided it acts in good faith toward the insured in making this determination. "Considerable leeway, of course, must be made for the insurer's honest business judgment, short of mismanagement tantamount to bad faith." *Davis,* 412 F.2d at 481.

I find that CNA did not act in bad faith in managing its insured's proceeds in the face of two liability claims, each of which was likely to exceed the insured's coverage. CNA reasonably believed Tripp had $27,000 in coverage. The safest course for CNA to have followed may have been to settle Mr. Peckham's claim for the coverage limits and leave Tripp exposed to a potential excess judgment on Mrs. Peckham's loss of consor-

tium claim. I find, however, that CNA, by attempting to negotiate a settlement of Mrs. Peckham's claim before settling Mr. Peckham's claim, was at that early stage in the negotiations attempting to manage the insured's limited proceeds in a manner reasonably calculated to minimize his total liability.

■ As discussed *supra,* CNA never informed Tripp of the pendency or implications of *Bilodeau* before the Supreme Judicial Court. In addition, CNA did not inform Tripp of Mr. Peckham's offer to settle his claim for $27,000 and Mrs. Peckham's claim for $20,000 or to settle Mr. Peckham's claim alone for $27,000 before July 17, 1984. In *Murach v. Mass. Bonding and Ins. Co.,* 339 Mass. 184, 158 N.E.2d 338 (1959), the court held that:

> Where a claim is made for an amount greater than the limits of the policy, it is obvious that the insured may be exposed to liability up to the amount of the excess. It is the duty of the insurer to disclose to its insured its adverse interest with respect to the extent of its liability under the policy. Here the insurer fulfilled its duty in this respect by its communication to the insured advising them of the possibility of a verdict in excess of the policy limit and suggesting that they retain personal counsel.

*Id.* at 189, 158 N.E.2d 338. The failure to disclose an offer of settlement to the insured can be considered as bearing on the insurer's lack of good faith. *Id.* (citing *Service Mut. Liab. Ins. Co. v. Aronofsky,* 308 Mass. 249, 252, 31 N.E.2d 837 (1941)). Therefore I find that CNA's delay in keeping its insured Tripp fully informed of settlement offers and by failing to advise him of the pendency and implications of *Bilodeau,* between the filing of the Peckhams' suit against Tripp on April 19, 1984, and the Supreme Judicial Court's decision in *Bilodeau* on July 17, 1984, constituted bad faith.

■ I find, however, that CNA's bad faith during this period was not the cause of Tripp's exposure to the excess judgment entered against him in Bristol County Superior Court. Instead, I find that the actions of Attorney Corey (1) by precipitously breaking off settlement negotiations in failing to re-

spond to a reasonable settlement offer while CNA reasonably believed negotiations were still in progress; (2) by abruptly filing suit against the insured on April 19, 1984, in the midst of settlement negotiations; and (3) by not providing CNA the opportunity to consider the Peckhams' settlement offer in contemplation of the imminent filing of a lawsuit and the opportunity to inform its insured of such offer before filing suit, caused Tripp's damages in excess of the policy limits. Attorney Corey was under no duty to the insured or to CNA. His only duty was to represent the Peckhams zealously within the bounds of the Rules of Professional Responsibility. This does not mean, however, that Attorney Corey's actions could not be the legal cause of the insured's damages. *Cf. Adduci v. Vigilant Ins. Co.*, 98 Ill.App.3d 472, 53 Ill.Dec. 854, 424 N.E.2d 645, 648–49 (1981) (to state a cause of action for bad faith failure to settle within policy limits insured must allege sufficient well-pleaded facts to indicate that the breach of duty was the legal cause of harm to the insured).

I find that Attorney Corey's actions were the legal cause of Tripp's exposure to an excess judgment. CNA first knew of the terms of the Peckham's alternative settlement offers [10] on February 15, 1984. CNA responded with a counter-offer on March 15, 1984. Corey's failure to respond to CNA's March, 1984 settlement offer and then his precipitous filing of suit and foreclosure of further settlement negotiations caused Tripp's damages.

■ "An insurer is not required to rush to settlement." *Davis*, 412 F.2d at 483. On the contrary, an insurer's "overeager" settlement is evidence of bad faith. *Id.* (citing *Brown v. United States Fidelity & Guaranty Co.*, 314 F.2d 675 (2d Cir.1963)). Attorney Corey's foreclosure of settlement within ninety days of his initial offer prevented CNA from considering other settlement positions. CNA believed that negotiations were continuing until it learned that the Peckhams had filed suit. While CNA may have been negligent

in failing to inform Tripp of settlement offers between February 15, 1984, and the filing of suit on April 19, 1984, I find this did not constitute bad faith.

I find, however, that CNA was in bad faith after the filing of suit against Tripp, at least between May 22, 1984 [11] and July 17, 1984, by its delay in fully informing Tripp of prior settlement offers and by its failure to advise him of the pendency and implications of *Bilodeau* prior to July 17, 1984, but that this bad faith did not cause Tripp's damages. By April 19, 1984, with the filing of the *Tripp* suit, the Peckhams were irrevocably committed to bringing a "bad faith" settlement suit against CNA and were committed to refusing any further settlement offers that might be forthcoming from CNA. Corey did not respond to CNA's March 15, 1984 settlement offer; he informed Cooney on May 30, 1984, that his previous offer was no longer open and that he was now seeking a reasonable offer in excess of the policy limits due to a potential "bad faith" claim; he reiterated this position to Cooney on June 6, 1984. Attorney Corey believed that CNA's action had exposed Tripp to a "multi-million dollar judgment." (Exhibit 22). Once Corey believed that Tripp had a bad faith claim against CNA he had to press the Peckhams' claims against Tripp in the underlying tort case to expose Tripp to an excess judgment. Corey's refusal to accept the July 31, 1984 CNA offer to settle both claims for $47,000 merely evidenced a firm and final decision not to settle already made by him at least as of April 19, 1984. Therefore, I find that any "bad faith" committed by CNA after April 19, 1984, did not cause Tripp's exposure to an excess judgment. As of at least that date Corey believed Tripp had a bad faith claim against CNA and it was Corey's decision to seek an excess judgment against Tripp and not to consider any further settlement offers. Even if CNA had kept Tripp fully informed between April 19, 1984 and July 17, 1984, Corey would have rejected any Tripp settlement offers made during this period.

**10.** As discussed *supra,* the Peckhams would have settled Scott Peckham's claim separately for $27,000 and resolved Jo Anne Peckham's claim at a later date or settled Scott Peckham's claim

for $27,000 and Jo Anne Peckham's claim for $20,000.

**11.** *See infra* n. 6.

### (2) *Stage II*

As discussed *supra*, at 76, the Peckhams allege that CNA breached its contract to the insured in two distinct time frames. Stage I relates to the period between the date of the accident in August, 1983, to the *Bilodeau* decision in July, 1984. Stage II relates to the date of the *Bilodeau* decision to the conclusion of the Peckhams' suit against Tripp in March, 1987.

After the *Bilodeau* decision was reported, the insurer was willing to settle both claims for the full settlement amount of $47,000. The Peckhams refused to accept this offer and made a proposal in September, 1984, which included terms relating to a potential "bad faith" settlement claim against CNA. CNA had been aware since the Spring of 1984 that the Peckhams were considering such a claim. The Peckhams' proposal sought $47,000 for holding Tripp harmless and a demand that the damages for their prospective "bad faith" claim be assessed by a jury in the tort suit against Tripp. CNA, now considering its own legal interests, as well as Tripp's, agreed to all terms of the Peckhams' proposal except that it countered with a proposal that damages in a prospective "bad faith" suit be determined as part of the "bad faith" suit.

I find that an insurance company could, in good faith, decline to enter into a settlement agreement which would have required it to defend itself on the issue of damages in a prospective "bad faith" suit in a tort action before a jury rather than in a ch. 93A action before a judge. "Good faith" toward its insured does not require an insurance company to refrain from protecting its own legal interests, so long as in doing so, it exercises its duty towards its insured in equal manner. *See Davis*, 412 F.2d at 480; *Adduci*, 53 Ill.Dec. 854, 98 Ill.App.3d 472, 424 N.E.2d at 648.

### IV. *Conclusion*

### A. *Failure to Settle*

The Peckhams allege that CNA breached its contract with Tripp by failing to respond to settlement offers in good faith and that CNA's lack of good faith violated ch. 93A.

I find that CNA did not act in bad faith in managing its insured's insurance coverage when faced with two liability claims, each of which was likely to exceed the insured's coverage. CNA was still trying to negotiate the best possible settlement for its insured at the time Corey retracted the Peckhams' prior settlement offer. Therefore, CNA's failure to settle Mr. Peckham's claim for $27,000 and Mrs. Peckham's claim for $20,000 or Mr. Peckham's claim alone for $27,000 did not violate ch. 93A.

### B. *Ch. 176D*

The Peckhams allege that CNA violated Mass.Gen.L. ch. 176D, § 3(9)(f)(m) and (n) and that violations of ch. 176D constitute per se violations of Mass.Gen.L. ch. 93A. I need not reach this issue because I find that CNA did not violate ch. 176D.

I find that offer of March 23, 1984, was a "prompt, fair and equitable" offer. Therefore CNA did not violate ch. 176D, § 3(9)(f).

I find that CNA's insistence on a husband-wife release before settling Mr. Peckham's claim was to protect Tripp from a potential excess judgment on Mrs. Peckham's loss of consortium claim and not to influence impermissively "settlements under other portions of the insurance coverage." Therefore CNA did not violate ch. 176D, § 3(9)(m).

I find that CNA promptly provided the Peckhams with a "reasonable basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement" by informing Attorney Corey that CNA believed that loss of consortium was covered within the "per person" limit of coverage and not within the "per accident" aggregate. Therefore CNA did not violate ch. 176D, § 3(9)(n).

### C. *Failure to Advise Tripp of Right to Appeal*

The Peckhams allege that CNA's staff counsel violated ch. 93A by not informing Tripp of his right to appeal the jury verdict entered against him in Bristol Superior Court in *Peckham v. Tripp*, and that this constituted a violation of ch. 93A. I find the testimony of Attorney Sterritt that he informed Tripp of his right to appeal credible.

In the alternative, even if Tripp were not informed of his right to appeal, I find no causal connection between this alleged "unfairness" and the damages sustained by Tripp.[12]

### D. CNA's Staff Counsel's Coverage Letter

 Attorney Christine Cooney was CNA's staff counsel who represented Tripp in the underlying tort action. On June 29, 1984, Attorney Cooney drafted a coverage letter to Tripp without informing him that she had drafted the letter. This coverage letter failed to inform Tripp that, depending on the outcome of *Bilodeau*, he might have an additional $20,000 in coverage. I find that CNA's staff counsel's failure to inform Tripp that she had drafted the coverage letter in conjunction with her failure to inform him of the pendency and implications of *Bilodeau* constituted bad faith and a violation of ch. 93A.

### E. CNA's Response to Ch. 93A Demand Letter

CNA's refusal to pay the Peckhams, as assignees of Tripp, the excess judgment in response to the Peckhams' ch. 93A letter did not constitute bad faith. CNA reasonably believed that it was not liable to the Peckhams, as assignees of its insured Tripp, for any violation of ch. 93A. Therefore, CNA's refusal to make an offer of settlement in response to the 93A demand letter was not a violation of ch. 93A.

### F. CNA's Failure to Inform Tripp of Settlement Offers and of Bilodeau

CNA, by failing to inform Tripp before July 17, 1984, that he could have settled Mr. Peckham's claim for $27,000 and Mrs. Peckham's claim for $20,000 or Mr. Peckham's claim alone for $27,000 and by failing to advise Tripp of the pendency and implications of *Bilodeau*, violated ch. 93A.

The insured Tripp did not sustain a loss of money or property as a result of defendant's use of unfair or deceptive practices.[13] Tripp, however, was injured by CNA's conduct. Tripp had a legally protected right to be informed of offers of settlement and of his potential insurance coverage. Mr. Peckham and Mrs. Peckham, as assignees of Tripp, have shown by a preponderance of the evidence that the defendant violated ch. 93A. Accordingly, judgment shall be entered for the plaintiffs on Count V and damages shall be awarded in the amount of twenty-five dollars.

The Court will schedule a hearing to calculate the award of reasonable attorney fees.

---

12. There has been no evidence that Tripp had any grounds for appeal.

13. By St.1979, ch. 406, § 1, the Massachusetts Legislature eliminated the loss of money or property as an element of an action under ch. 93A, for injury from an unfair and deceptive act or practice.