William C. HAYS, Executor of the
Estate of Arthur Groves, Plaintiff,

v.

MOBIL OIL CORPORATION,
Defendant.

Civ. A. No. 87–1089–WF.

United States District Court,
D. Massachusetts.

May 10, 1990.

Robert F. Corliss, Corliss & Romero, Boston, Mass., for plaintiff.

Robert M. Gault, H. Joseph Hameline, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

WOLF, District Judge.

Plaintiff William Hays, the executor of the estate of Arthur Groves, has brought suit against defendant Mobil Oil for indemnification of cleanup costs on property owned by the estate. The property was formerly the site of a Mobil franchise owned and operated by Groves. Defendant has moved for summary judgment on all counts, relying primarily on the statute of limitations and the existence of a contractual indemnification clause in its favor. Plaintiff has moved for summary judgment on counts three and five of his complaint, alleging violation of M.G.L. c. 93A and common law and statutory indemnification rights respectively, and has opposed defendant's motion with respect to counts four and six. Plaintiff has waived the claims asserted in counts one and two. Plaintiff's Brief in Support of Its Motion for Summary Judgment on Counts Five and Three of the Complaint and in Opposition to Defendant's Motion for Summary Judgment at 25. For the reasons stated below, the court grants summary judgment for the defendant on all counts.

## I. FACTS

Except where otherwise noted, the following facts are not in dispute. From 1940 to 1977, Arthur Groves operated a Mobil dealership on property he owned in Waltham, Massachusetts. Plaintiff's Responses to Defendant's Request for Admissions at No. 27 (hereinafter "Pl. Adm."). From 1956 to 1977, Groves employed David King as his assistant in this enterprise. Affidavit of David King at ¶ 2 (March 3, 1988).

In 1940, Mobil installed three underground gasoline tanks and an underground waste oil tank on Groves' property pursuant to an equipment loan agreement. Defendant's Response to Plaintiff's Request for Admissions at Nos. 2–3 (hereinafter "Def. Adm."). The gasoline tanks were replaced by larger tanks in or around 1962. Deposition of David King at 8, 16 (June 1, 1988). Mobil retained ownership of the four tanks from 1940 to 1977. Pl. Adm. at Ex. A–H.

From November, 1950 through November, 1975 a contract was in force between Mobil and Groves which included the following provision relating to all loaned equipment:

[Mobil] agrees (a) to paint said equipment whenever deemed necessary by it for preservation and (b) to repair it to the extent deemed necessary by it to keep it in operating condition, provided [Mobil] is notified in writing that the item in question is not in good operating condition and [Mobil] shall have determined in its uncontrolled discretion and within a reasonable period that the need for repair is not due to the negligence or misconduct of [Groves] or [Groves'] agents or employees. [Groves] shall make the item harmless and shall not use or permit

anyone else to use it until repaired. In lieu of repairing, [Mobil] may replace. Pl. Adm. at No. 15. A contract in force between November, 1975 and November, 1977 contained a similar provision.[1] The 1940–50 loan agreement did not obligate Mobil to repair the equipment at all. Pl. Adm. at No. 17.

At all times from November, 1950 through November, 1975, equipment loan agreements were in effect between Mobil and Groves which stated:

> [Groves] shall indemnify [Mobil] against all losses and claims (including those of the parties, their agents and employees) for death, personal injury or property damage arising out of (1) the use or condition of [Groves'] premises or the equipment and facilities thereon, regardless of any defects therein, (2) [Groves'] nonperformance of this contract or (3) the storage and handling of products on the premises. [Mobil] does not warrant or guarantee any equipment or facilities.

Pl. Adm. at Nos. 9–12, 22. Contracts covering the periods 1940 to 1950 and 1975 to 1977 included similar provisions.[2]

Finally, from November, 1950 until November, 1977, the retail dealer contracts between Mobil and Groves provided:

> [Groves] agrees in consideration of [Mobil's] execution of this contract that any claim of any kind by [Groves] based on or arising out of this contract or otherwise shall be barred unless asserted by [Groves] by the commencement of an action within 12 months [6 months in contracts in effect from 1950 to 1961] after the delivery of the products or other event, action or inaction to which the claim relates. This provision shall survive any termination of this contract, however arising.

Pl. Adm. at Nos. 9–13, Ex. C–G.

In 1971, Groves informed Mobil that the waste oil tank was in need of repair. King Dep. at 11. Mobil sent a contractor to the station who discovered that one of the filler pipes had broken from the tank and was dumping waste oil directly into the soil surrounding the tank. *Id.* at 12. The contractor replaced the pipe and tank, refilling the hole with the contaminated soil. *Id.* at 10–13.

Shortly after the contractor's visit, Groves and King noticed that the ground above the waste tank was too soggy to support a parked car. Groves complained to Mobil, which again notified the contractor. The contractor removed approximately a half foot of soil from the surface, replaced it with clean fill and paved the area with asphalt. King Dep. at 14–15; King Aff. at ¶ 5. Groves and King dis-

---

1. The later contract provided:
   [Mobil] at its expense shall make repairs (including painting) deemed necessary by it to keep the equipment in good operating condition provided the necessity therefor is due to ordinary wear or to damage by the elements. [Mobil's] obligation to repair shall not arise until (a) [Mobil] is notified that the item in question is not in good operating condition and (b) [Mobil] shall have determined in its uncontrolled discretion and within a reasonable period that the necessity for repair is due to a cause referred to above. [Groves] shall either make the item harmless or shall not use it or permit it to be used until repaired. In lieu of repairing, [Mobil] may make replacements.
   Pl. Adm. at No. 16.

2. The 1940–50 contract provided:
   [Groves] agrees to defend and indemnify [Mobil] and hold it harmless from all claims, liability, loss or damage arising in connection with the violation of any law or regulation in respect of said equipment or premises or any

loss, damage, injury or other casualty to [Groves] or to any other party or person, or any property, caused or occasioned by any leakage, fire or explosion of any products in said equipment or the presence or use of said equipment or arising on or about the premises whereon said equipment may be installed or used, whether due to imperfections in said equipment, fault in installation or negligence of [Mobil] or any other person or party. [Mobil] does not warrant said equipment in any respect, and all such equipment is loaned on [Groves'] sole responsibility without recourse to [Mobil].
Pl. Adm. at Nos. 7, 20. The 1975–77 contract stated:
[Groves] shall indemnify and hold [Mobil] harmless against all losses and claims (including those of the parties, their agents and employees) for the death, personal injury or property damage arising out of (1) the use or condition of the equipment.... [Mobil] does not warrant or guarantee the equipment.
Pl. Adm. at Nos. 14, 24.

cussed the fact that the soil around the tank was contaminated to a depth of perhaps six feet, but Groves stated that he only cared about the stability and cleanliness of the surface. King Dep. at 14–15; King Aff. at ¶ 5. After the surface was paved, neither Groves nor King informed Mobil of any further contamination problems. King Aff. at ¶ 6.[3]

In 1976, Groves informed Mobil that one of the gasoline tanks was taking on water as a result of a high groundwater table. King Dep. at 16–19. Mobil relined the tank, but did not detect any leakage of gasoline. *Id.* Neither Groves nor King ever notified Mobil of any other problems with the tanks. King Aff. at ¶ 9.

In November, 1977, Groves retired from the service station business, agreeing to lease his premises to David King. King leased the station from Groves until Groves' death in 1982 and from his estate until 1985. King Aff. at ¶ 3. King was required to maintain the station as a Mobil dealership under the terms of the lease. King Aff. at ¶ 4, Ex. A. Groves consented to King's entry into dealership and equipment loan agreements with Mobil in 1977. *Id.*

In May, 1979, King purchased the four underground tanks and related piping from Mobil for $26.25. King Dep. at 34–5; Amended Complaint at Ex. A. King informed Groves of the proposed transaction and received his permission for the deal, but Groves was not a party to the contract. King Aff. at ¶ 12; King Dep. at Ex. 13. Groves did not give any approval to Mobil to sell the equipment or to leave it on his property once it was sold. Appendix to Plaintiff's Brief Relating to Cross Motions for Summary Judgment at Ex. B (hereinafter "Pl. App.").

Neither King nor Groves wanted to purchase the equipment, but King believed that Mobil might not renew his dealership if he failed to do so. King Dep. at 34–39. Mobil informed King that it wished to sell the tanks to relieve itself of responsibility for maintaining equipment on property it did not own. King Aff. at ¶ 11–12. In fact, Mobil had adopted a policy of selling equipment in such circumstances to limit exposure to legal liability as well as maintenance responsibilities. Def. Adm. at Nos. 14–15; Pl. App. at Ex. W, X. Dealers who refused to buy Mobil's tanks or otherwise acquire their own storage equipment would not have their contracts renewed under this policy. *Id.* King currently declares that there was nothing deceptive in the sale of the tanks to him. King Aff. at ¶ 11.

As part of the contract of sale, Mobil installed new pump calculators on the tanks which could handle prices in excess of $1.00 per gallon. King Dep. at 34–35. King agreed to assume all responsibility for maintenance of the equipment and all liability for damages and injury caused by the equipment from the time of sale forward. Amended Complaint at Ex. A.

King was familiar with the age and condition of the tanks at the time of sale, due to his long employment at the station. King Aff. at ¶ 10–11. In addition, a week before the sale, a Mobil representative performed a detailed reconciliation of the station's gasoline inventory which demonstrated that the tanks did not leak. Affidavit of John Martin (September 19, 1988). Reconciliation performed regularly by Groves and King from 1956 until 1985 also failed to show leakage from the gasoline tanks. King Dep. at 9.

In June, 1985, the service station was closed. The City of Waltham ordered plaintiff to remove the underground tanks and plaintiff requested that defendant do so. Mobil refused by letter dated September 24, 1985 on the grounds that it no longer owned the tanks and had no duty or right to remove them at plaintiff's request. Def. Adm. at Nos. 21–22. The tanks were removed by plaintiff in 1985 at a cost of $7,700.

Upon removal of the tanks, plaintiff and the City discovered that the soil underneath the premises was contaminated by gasoline

---

**3.** Plaintiff denied the occurrence of this conversation in response to defendant's request for admissions, but has provided no evidence to rebut King's unambiguous statements. Pl. Adm. at Nos. 29–37.

and waste oil. The state Department of Environmental Quality Engineering ("DEQE") was notified and in October, 1985 demanded that plaintiff clean up the site. Plaintiff did so at a cost of $93,-007.11, receiving a "release" letter from DEQE on August 25, 1986. Pl. App. at Ex. U. Mobil refused several requests for contribution and indemnification of the clean-up costs during this time period, again interposing the transfer of the tanks to King as a defense.

On October 17, 1986, plaintiff sent Mobil a demand for full indemnification pursuant to chapter 93A, charging that Mobil's prior refusal to aid in the tank removal and cleanup was an unfair and deceptive act under the statute. Plaintiff filed this lawsuit in state court on February 4, 1987. Defendant subsequently removed it to this court. The final amended complaint in this court stated six causes of action for negligence (Count 1), breach of warranty (Count 2), violation of M.G.L. c. 93A (Count 3), right to indemnification under common law principles and M.G.L. c. 21E (Counts 4 & 5), and right to contribution under M.G.L. c. 231B (Count 6). On the cross-motions for summary judgment, plaintiff waived his first and second causes of action.

## II. DISCUSSION

### A. *Summary Judgment Standard*

The court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which provides that the court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In addition, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *Stepanischen v. Merchants Despatch Trans. Corp.*, 722 F.2d 922, 928 (1st Cir.1983).

However, to survive a summary judgment challenge on the basis of disputed material facts, the plaintiff must produce substantial evidence, going beyond the allegations of the complaint and supporting the claimed dispute, which would require a judge or jury to resolve the conflicting versions of the truth at trial. *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). *See also Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Matsushita Electrical Industrial Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986) (opponent must "do more than simply show that there is some metaphysical doubt as to the material facts").

In deciding motions for summary judgment, the court must make two inquiries: (1) whether the factual disputes are genuine, and (2) whether any fact genuinely in dispute is material. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* To determine if the dispute about a material fact is "genuine," the court must decide whether "the evidence is such that a reasonable [fact-finder] could return a verdict for the nonmoving party." *Id.* The party opposing the motion must "provide the court with 'some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim.'" *Arsenault v. Allegheny Airlines*, 485 F.Supp. 1373, 1378 (D.Mass.1980) (quoting *Hahn*, 523 F.2d at 468).

### B. *Application of the Summary Judgment Standard to This Case*

#### 1. *The Indemnification and Contribution Claims*

■ Plaintiff seeks indemnification or contribution from defendant under the

common law, M.G.L. c. 21E [4] and M.G.L. c. 231B [5] for the costs of cleaning up the gas station site. Discovery in the case has isolated the 1971 waste oil tank leak as the source of the ground contamination at issue; the evidence would not permit a reasonable finder of fact to reach any other conclusion concerning the source of the contamination. At that time, and at all times during the franchise relationship between Groves and Mobil, the franchise and equipment loan agreements provided that Groves "shall indemnify [Mobil] against all losses and claims ... for ... property damage arising out of ... the use or condition of [Groves'] premises or the equipment and facilities thereon, regardless of any defects therein, ... or the storage and handling of products on the premises." This provision defeats plaintiff's claims for indemnification and contribution under the common law and M.G.L. chapters 21E and 231B.

In *Shea v. Bay State Gas Co.*, 383 Mass. 218, 418 N.E.2d 597 (1981), the Massachusetts Supreme Judicial Court rejected plaintiff's argument that a contractual indemnification clause should be strictly construed against the drafter and indemnitee. "As indicated in *Shea*, an indemnity provision is no longer to be read with any bias in favor of the indemnitor and against the indemnitee; it is to be interpreted like any ordinary contract, with attention to language, background, and purpose." *Speers v. H.P. Hood, Inc.*, 22 Mass.App.Ct. 598, 600, 495 N.E.2d 880, *rev. denied*, 398 Mass. 1105, 498 N.E.2d 125 (1986). The *Shea* Court and subsequent opinions have reasoned that indemnity clauses reflect a reasonable allocation of risks and duties to insure

achieved through negotiation between the parties. *See Martino v. Mobil Oil Corp.*, C.A. No. 85–3865–MA, slip op. at 5, 1987 WL 6973 (D.Mass. Jan. 29, 1987) (granting summary judgment to defendant on basis of indemnity clause). Such provisions have been deemed enforceable even where the indemnitee was concurrently or solely negligent and the clause did not specifically encompass such behavior. *Speers*, 22 Mass.App.Ct. at 602, 495 N.E.2d 880; *Aho v. Blanchette*, 18 Mass.App.Ct. 149, 152, 463 N.E.2d 1203 (1984).

Plaintiff contends that the indemnification clause here does not cover cleanup costs, because it refers only to "losses and claims for ... property damage." Plaintiff's argument founders on clear precedent in the courts of Massachusetts and this district. In *Chemical Applications Co. v. Home Indemnity Co.*, 425 F.Supp. 777 (D.Mass.1977), Senior Judge Aldrich addressed a similar issue in the context of a commercial insurance policy. Judge Aldrich wrote:

> The facts were stipulated, and so, apparently, is the correctness of plaintiff's contention that such loss [the cleanup costs of an oil spill] constitutes "property damage" within the terms of the policy. There is no contrary contention in defendant's brief, and I so find, given the general purpose of the policy and the basic rule that terms are to be construed in favor of the insured.... The statutory liability is in no real sense a penalty, but is precisely measured in terms of the damage caused by the spill.

**4.** Section 4 of M.G.L. c. 21E, the Massachusetts Oil and Hazardous Material Release Prevention Act, provides, in relevant part:

> Any person who undertakes assessment, containment or removal action regarding the release or threat of release of oil or hazardous material shall be entitled to reimbursement from any other person liable for such release or threat of release for the reasonable costs of such assessment, containment and removal. If such release resulted from the negligence of two or more persons, each shall be liable to the others for his pro rata share of the costs of assessment, containment and removal.

There is no question that Mobil Oil is a "person liable" under section 4 as the former owner of the waste oil tank. M.G.L. c. 21E, § 5(a)(2).

**5.** Chapter 231B generally governs contribution among joint tortfeasors in the Commonwealth. Because Chapter 21E establishes an independent cause of action for contribution and indemnification, the court finds that plaintiff's claim is properly analyzed under that chapter, rather than the more general provisions of Chapter 231B. *Sheehy v. Lipton Industries, Inc.*, 24 Mass.App.Ct. 188, 197, 507 N.E.2d 781 (section 4 "creates a private right of action to enforce the purposes of the Act"), *rev. denied*, 400 Mass. 1103, 509 N.E.2d 1202 (1987).

425 F.Supp. at 778 (cites omitted). A recent Massachusetts opinion also rejected the argument that the cleanup costs of an oil spill were not "damages on account of property damage." *Shapiro v. Public Svc. Mut. Ins. Co.*, 19 Mass.App.Ct. 648, 477 N.E.2d 146, *rev. denied*, 395 Mass. 1102, 480 N.E.2d 24 (1985). In that case, the court held the defendant insurance company liable for not defending its insured in a suit by the state to recover cleanup costs. *Id.* at 653–55, 477 N.E.2d 146. Like *Chemical Applications, Shapiro* drew a distinction between cleanup costs and civil or criminal penalties. In this case, no penalties or fines have been assessed against plaintiff, and he seeks indemnification only of the costs of containment and removal. These costs were necessitated by the actual physical damage caused to the subject property by the waste oil contamination and in some sense reflected the diminution in value of the property in its polluted state.

Plaintiff's contention also runs counter to the language, background, and purpose of the indemnification clause. One of the most obvious and significant threats to property arising out of the storage of gasoline in underground tanks is accidental leakage. This was clear even in the days before enactment of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and chapter 21E. If contamination of neighboring properties had occurred, one ready measure of the property damage in any suit against Mobil or Groves would have been the costs of cleanup and removal. The fact that cleanup was not statutorily required in 1971 does not eliminate such costs as a constituent of "property damage." In this respect, the reasoning of the court in *Aho* is instructive. In *Aho* the court held an indemnitor liable to a railroad for injury to any persons using a crossing constructed by the indemnitor for its own purpose, because " '[i]t would not be a reasonable interpretation that the parties ... excluded from coverage [of the indemnity provision] one of the most frequent grounds of liability in railroad operation.' " *Aho*, 18 Mass. App.Ct. at 152, 463 N.E.2d 1203 (quoting

*New York, N.H. & H.R. v. Walworth Co.*, 340 Mass. 1, 7, 162 N.E.2d 789 (1959)). Similarly, it would not be reasonable here to exclude from the coverage of the indemnification clause one of the most common costs incurred by those who store oil in underground tanks.

█ Plaintiff also argues that M.G.L. c. 21E, § 5(f) embodies a statutory policy against indemnification clauses with respect to cleanup costs. That provision states:

(f) No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or site or from any person who may be liable for a release or threat of release of hazardous material under this section, to any other person the liability imposed under this section. Nothing in this paragraph shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

The court construes this section to provide only that contractual indemnification clauses will not shield a liable party from a suit by the state or injured third parties to recover damages and cleanup costs. As it expressly states, however, "Nothing in this paragraph shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section." M.G.L. c. 21E, § 5(f). In other words, indemnification clauses are still permitted to allocate the burdens of risks and costs among otherwise liable parties. Nothing in *Sheehy v. Lipton Industries, Inc.*, 24 Mass.App.Ct. 188, 197, 507 N.E.2d 781 (1987), cited by plaintiff, is to the contrary.

### 2. The Chapter 93A Claim

Plaintiff alleges that defendant's refusal to contribute to the removal of the underground tanks and the cleanup of Groves' property violated M.G.L. c. 93A. In particular, plaintiff charges that defendant unfairly and deceptively relied on the transfer of the tanks to King to deny its liability under chapter 21E. Defendant counters that plaintiff does not have standing to

bring a chapter 93A claim and that its actions did not violate chapter 93A as a matter of law.

■ Chapter 93A grants standing to any commercial entity which "suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice...." M.G.L. c. 93A, § 11. Defendant's standing argument would be correct if plaintiff was now protesting the sale of the tanks to King. *See Shell Oil Co. v. Hennessy*, 639 F.Supp. 626 (D.Mass.1986) (purchasers of real property lack standing to challenge conscionability of pre-existing lease which granted lessees right of first refusal). However, plaintiff here argues that it was the bad faith and groundless use of that sale to deny liability for the tank removal and cleanup costs that constituted the unfair or deceptive act. Plaintiff has been injured by this alleged conduct because he was forced to expend the estate's own money on these projects and was required to incur legal fees in bringing defendant to court in an attempt to recover those costs. These allegations satisfy plaintiff's burden of demonstrating "a causal connection between the [defendant's alleged] deception and the [plaintiff's] loss" which was a *"foreseeable* consequence of the [defendant's alleged] deception." *Kohl v. Silver Lake Motors, Inc.*, 369 Mass. 795, 801, 343 N.E.2d 375 (1976) (emphasis in original). The court finds that this case is similar to those in which the state and federal courts have entertained, without standing problems, chapter 93A claims brought by insureds against insurers who denied coverage or the duty to defend. *See Boston Mutual Life Ins. Co. v. Fireman's Fund Ins. Co.*, 613 F.Supp. 1090 (D.Mass. 1985); *Gulezian v. Lincoln Ins. Co.*, 399 Mass. 606, 506 N.E.2d 123 (1987).

■ Although plaintiff has standing to bring his claim, he has not demonstrated sufficient facts to survive a motion for summary judgment. The Court of Appeals for the First Circuit recently reiterated the standard for liability under chapter 93A in a commercial context, in an opinion affirming a summary judgment dismissal of a chapter 93A claim.

Litigation under Mass.Gen.L. ch. 93A is rampant, but a common refrain has developed. "The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979); *see also Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515–16 (1st Cir.1988) (unscrupulous or unethical conduct usually required); *Williams v. Arndt*, 626 F.Supp. 571, 581–82 (D.Mass. 1985) (similar). In other words, a chapter 93A claimant must show that the defendant's actions fell "within at least the penumbra of some common-law, statutory, or other established concept of unfairness," or were "immoral, unethical, oppressive or unscrupulous," and resulted in "substantial injury ... to competitors or other businessmen." *PMP Associates, Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915, 917 (1975); *accord Pepsi–Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 17–18 (1st Cir.1985); *Levings*, 396 N.E.2d at 153.

*Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1513 (1st Cir. 1989).

The court now finds that defendant's alleged conduct in refusing to contribute to plaintiff's cleanup and removal costs was neither unfair nor unscrupulous, nor was it outside the bounds of normal business ethics and behavior. Thus, even if proven, such conduct would not entitle plaintiff to prevail on his chapter 93A claim. Put differently, none of the genuinely disputed facts concerning the chapter 93A claim are material and defendant is entitled to judgment on that claim as a matter of law.

In *Boston Mutual Life*, the district court granted defendant's motion for summary judgment where it found that defendant had asserted, in good faith and with a reasonable basis, a technical defense to

coverage under the insured's policy. The court stated:

> Plaintiff argues that defendant's explicit reservation of defenses other than late notice, as well as relying on late notice, was an unfair and deceptive act or practice. I do not so find. Instead, I find that defendant acted reasonably and in good faith in reserving its rights to contest liability. In these circumstances I do not address the question whether such a claim would ever be viable without success on a primary assertion of liability under the policy.

613 F.Supp. at 1107. Similarly, the Massachusetts Supreme Judicial Court has noted, "An insurance company which in good faith denies a claim of coverage on the basis of a plausible interpretation of its insurance policy is unlikely to have committed a violation of G.L. c. 93A." *Gulezian*, 399 Mass. at 613, 506 N.E.2d 123; *see also Higgenbottom v. Aetna Casualty & Surety Co.*, 12 Mass.App.Ct. 927, 927–28, 425 N.E.2d 370 (1981) (rejecting chapter 93A claim where insurer's refusal to defend was reasonably based on clear exclusion to policy).

Defendant's refusal to indemnify in this case is analogous to an insurer's good faith refusal of coverage. Defendant has asserted several reasonable defenses to plaintiff's claims for contribution, including the contractual indemnification clause between itself and Groves. While defendant admits that the sale of the tanks to King does not absolve it of liability for the 1971 waste oil leakage, it also notes that it was only after discovery in the instant suit that this spill was identified as the source of the contamination in question. The evidence indicates that in its original responses to plaintiff's requests, defendant reasonably assumed that the contamination resulted from a post–1979 incident, and was therefore King's responsibility, rather than its own. Thus, its refusal to contribute to the removal and cleanup costs in 1985–86 was made in good faith, because it no longer owned or controlled the tanks.

The documents submitted by plaintiff in support of his cross-motion for summary judgment fully support this version of events. Plaintiff did not identify the 1971 spill as the source of contamination at any time prior to the start of this lawsuit. Nor have the parties presented any evidence that defendant knew in 1971 that the soil was still contaminated. *See Gooley v. Mobil Oil Corp.*, 851 F.2d 513 (1st Cir.1988) (dismissing chapter 93A claim by franchisee where no evidence presented that franchisor knew or should have known that the property was contaminated). In addition, although defendant did not receive Groves' permission to sell the tanks to King or leave them on Groves' property, King states that *he* received Groves' approval. In fact, King's post–1979 leases from Groves required that he continue to operate a Mobil franchise on the property. Although Mobil may be a more attractive target for indemnification, plaintiff can thus look only to King for recovery of the tank removal costs.

Plaintiff has provided one of defendant's 1985 interoffice memoranda questioning whether Mobil should remove the tanks to minimize its exposure to environmental cleanup costs and other penalties. Pl. App. at Ex. F. However, this memorandum would not justify the conclusion that Mobil believed it had any legal duty to remove the tanks or contribute to the cleanup. Its subsequent denial of responsibility reflects a business decision that these actions were unnecessary in light of the actual financial and legal risks to the company. Where, as here, a company advances good faith, objectively reasonable defenses to claims of indemnification, its behavior has not reached the level of rascality or unfairness necessary to state a claim under chapter 93A.[6]

---

**6.** Plaintiff's reliance on *Pepsi–Cola Metropolitan Bottling Co. v. Checkers, Inc.*, 754 F.2d 10 (1st Cir.1985), and *Wang Laboratories, Inc. v. Business Incentives, Inc.*, 398 Mass. 854, 501 N.E.2d 1163 (1986), is misplaced. In *Pepsi–Cola*, the court found that the defendant engaged in "a form of extortion" when it withheld payments from plaintiff solely as a "wedge" to force concessions to which it was not legally entitled. 754 F.2d at 17–19. Here, on the other hand, the evidence demonstrates that the asserted debt is disputed in good faith and defendant seeks

### 3. Other Contentions

Apart from its substantive defenses, defendant contends that all of plaintiff's claims are barred by the one-year limitations clauses included in the franchise agreements or, alternately, that the chapter 21E cause of action is precluded by the three-year statute of limitations for tort which should have started running at the time of the 1971 waste oil spill. The court agrees that plaintiff's chapter 93A claim is subject to the contractual time-bar, but concludes that the chapter 21E cause of action is not precluded by either the one- or three-year limitations periods.[7]

Defendant's retail dealer contract with Groves provided that "any claim of any kind by [Groves] based on or arising out of this contract or otherwise shall be barred unless asserted ... within 12 months after the delivery of the products or other event, action or inaction to which the claim relates." The provision expressly survives termination of the contract.

■ The court is satisfied that this contractual time-bar is valid and enforceable. *See Reynolds Industries, Inc. v. Mobil Oil Corp.*, 618 F.Supp. 419, 422–23 (D.Mass. 1985) (one-year contractual limitations period valid because "not unreasonably abbreviated"); M.G.L. c. 106, § 2–725 (permitting contractual reduction of limitations period to one year). The court is also satisfied that the provision is broad enough to reach all claims arising out of the business relationship between the parties, including an unfair business practices claim deriving from defendant's refusal to indemnify plaintiff for the post-contract cleanup and removal of tanks which were originally installed pursuant to the parties' agreement.

■ Plaintiff's chapter 93A claim arose on September 24, 1985, when Mobil first denied responsibility for the removal costs of the underground tanks. The fact that plaintiff was not cognizant of the full extent of the associated cleanup costs at that time is immaterial, because in Massachusetts a cause of action accrues when the plaintiff learns or reasonably should have learned that it has been harmed as a result of defendant's conduct, not when the full extent of the injury is known. *Olsen v. Bell Telephone Laboratories, Inc.*, 388 Mass. 171, 175, 445 N.E.2d 609 (1983); *Gore v. Daniel O'Connell's Sons, Inc.*, 17 Mass.App.Ct. 645, 649, 461 N.E.2d 256 (1984). Since plaintiff did not send a demand letter to defendant until October 17, 1986, and did not file suit until February 4, 1987, more than a year after he learned of defendant's alleged unfair and deceptive denial of responsibility· for the tanks, his action under chapter 93A is barred by the one-year contractual limitations clause.

■ A different analysis applies to plaintiff's chapter 21E cause of action. Under this count, plaintiff seeks recovery of monies he spent to clean up the gas station site. He does not seek compensation for the damage to the land, but rather reimbursement for expenditures mandated by the state. Thus, his cause of action is really one for statutory indemnification. Generally for such claims, the statute of limitations does not begin to run until the indemnitee's liability becomes fixed, either through settlement or a final adjudication. *See Wolverine Ins. Co. v. Tower Iron Works, Inc.*, 370 F.2d 700 (1st Cir.1966); *Thornton v. Town of Hull*, 515 F.Supp. 715, 716 (D.Mass.1981); M.G.L. c. 231B, § 3(c)-(d) (limitations period for contribu-

---

nothing more than to be absolved from liability for the costs incurred by plaintiff. In *Wang*, contrary to plaintiff's interpretation, the chapter 93A violation was the willful and ungrounded breach of counter-claimant's consulting contract by plaintiff, not plaintiff's institution of a breach of contract suit against the counter-claimant. In any event, the refusal of defendant to indemnify plaintiff here did not constitute a bad faith assertion of defenses, because Mobil's defenses to liability are reasonable and, indeed, valid.

7. The Court of Appeals for the First Circuit has indicated that summary judgment may be particularly appropriate with regard to statute of limitations defenses, where, as here, "[t]here is no dispute between the parties as to the essential evidentiary facts ... but only as to the ultimate conclusions to be drawn from these facts." *Fidler v. Eastman Kodak Co.*, 714 F.2d 192, 198 (1st Cir.1983); *see also Kay v. Johnson & Johnson*, 722 F.Supp. 874, 878 (D.Mass.1989).

tion claim against joint tortfeasor begins running upon entry of final judgment against or payment of common liability by the third-party plaintiff). This is true even when the indemnitee can predict its liability to the injured third-party in advance. *Thornton*, 515 F.Supp. at 716.

The court finds that an action for "reimbursement" under c. 21E, § 4 is subject to this general rule. As with other actions for indemnification and contribution, plaintiff seeks recovery of payments made by him to a third-party for which he claims defendant is wholly or partly liable. In addition, the court notes that section 11·of the chapter, which authorizes the attorney general to sue private polluters for cleanup costs incurred by the state, establishes that the government's cause of action accrues after the commonwealth has incurred *"all* such costs" of assessment, containment and removal. M.G.L. c. 21E, § 11 (emphasis added). Thus, the court holds that the limitations period on plaintiff's chapter 21E cause of action did not begin to run when plaintiff first learned of the soil contamination, which could have been as early as 1971, but when plaintiff's liability for the cleanup of the site was finally fixed.

In this case, the extent of plaintiff's liability was finally and firmly established by the DEQE "release" letter of August 25, 1986. Plaintiff brought suit within a year of receipt of that letter. Defendant objects that plaintiff could have brought suit prior to that date, when it first learned of the contamination problem. While this is indeed the case, *Sheehy*, 24 Mass.App.Ct. at 199, 507 N.E.2d 781, such is true of indemnification and contribution actions in general, *Thornton*, 515 F.Supp. at 716. While a third-party complaint for such claims may be brought before a final judgment has been entered against the third-party plaintiff, the causes of action do not accrue for limitations purposes until a settlement or judgment is final. *Thornton*, 515 F.Supp. at 716.

Holding plaintiff's chapter 21E claim time-barred would run counter to public policy as well as to the law. If plaintiff had failed to pay the cleanup costs volun-

tarily, but was instead successfully sued by DEQE, even in light of the contractual limitations clause he could have delayed cross-claiming against defendant until a year after final judgment was entered. *Id.* Thus, barring plaintiff's action in the instant case because he freely complied with DEQE's requests, but did not sue until receiving a final release letter, would punish the plaintiff for his voluntary cooperation and frustrate the statute's purpose "to compel the prompt and efficient cleanup of hazardous material." *Sheehy*, 24 Mass. App.Ct. at 197, 507 N.E.2d 781. This court does not believe that chapter 21E was intended to encourage or reward recalcitrance on the part of liable parties.

■ Finally, the court holds that, on the present motion, plaintiff is not estopped, as defendant claims, from asserting his chapter 21E claim due to Groves' failure to inform defendant of the remaining soil contamination in 1971. "In order to work an estoppel, it must appear that one has been induced by the conduct of another to do something different from what otherwise would have been done and which has resulted to his harm and that the other knew or had reasonable cause to know that such consequence might follow. The doctrine of estoppel, however, is not applied except when to refuse it would be inequitable." *Boston & Albany R.R. v. Reardon*, 226 Mass. 286, 291, 115 N.E. 408 (1917).

Defendant has failed to establish an absence of genuine dispute on several of the elements of equitable estoppel on the present record. Defendant has not shown it would have acted any differently in 1971 had it known of the additional contamination or that it relied on Groves' silence in assuming that no further contamination existed. It is just as reasonable to assume that it relied on assurances or reports from its independent contractor. Further, given Mobil's independent duty under chapter 21E to guard against contamination, it is not apparent that it would be "inequitable" to decline to apply the doctrine of estoppel in this case. Thus, the doctrine of estoppel does not support defendant's claim for summary judgment.

## III. CONCLUSION

For the reasons stated above, the court hereby grants defendant's motion for summary judgment on all counts of plaintiff's complaint. Judgment shall, therefore, enter for the defendant.