**STONE & WEBSTER ENGINEERING CORPORATION, Plaintiff,**

v.

**DUQUESNE LIGHT COMPANY, Ohio Edison Company, and Pennsylvania Power Company, Defendants.**

No. Civ.A. 98–10612–PBS.

United States District Court,
D. Massachusetts.

Jan. 7, 2000.

W. Scott O'Connell, Richard C. Nelson, William C. Saturley, Gordon J. Mac-Donald, Nelson, Kinder, Mosseau & Gordon, Manchester, NH, Michael T. McInerny, Stone & Webster Engineering Corp., Boston, MA, for Stone & Webster Engineering Corporation, plaintiff.

Samuel M. Starr, Cristina D. Hernandez–Malaby, Mintz, Levin, Cohn, Ferris, Glovsky & Pompeo, P.C., Boston, MA, Thomas J. Madigan, Richard R. Nelson, III, Cohen & Grigsby, PC, Pittsburgh, PA, for Duquesne Light Co., Ohio Edison Company, Pennsylvania Power Company, defendants.

W. Scott O'Connell, Nelson, Kinder, Mosseau & Gordon, PC, Manchester, NH, for Stone & Webster Engineering Corporation, counter-defendant.

Samuel M. Starr, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, Cristina D. Hernandez–Malaby, Mintz, Levin, Cohn, Ferris, Glovsky & Pompeo, P.C., Boston, MA, Thomas J. Madigan, Richard R. Nelson, III, Cohen & Grigsby, PC, Pittsburgh, PA, for Duquesne Light Co., Ohio Edison Co., Pennsylvania Power Co., counter-claimants.

### MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

This case involves hotly disputed, multimillion dollar claims surrounding a twenty-three-year-old nuclear power plant in Pennsylvania. Beginning with a series of invoices issued in 1997, defendant Duquesne Light Company ("Duquesne") has refused to pay plaintiff Stone & Webster Engineering Corporation ("Stone & Webster") for engineering services recently performed in connection with the plant, sparking this declaratory judgment action. Duquesne bases its refusal to pay in part on Stone & Webster's alleged liability for defects in the original design and construction of the plant in the early 1970s. It also presses its own claims, including breach of contract and negligence claims, for damages incurred as a result of the defects.

Plaintiff has moved for summary judgment on its declaratory judgment claim that, as a matter of law, Pennsylvania's twelve-year statute of repose for construction projects, 42 Pa.Cons.Stat. § 5536, bars any offset or claim by defendants that stems from the plant's original design or construction.

After hearing and as explained below, the motion is *ALLOWED* with respect to defendants' affirmative claims that specifically arise out of their 1971 contract with plaintiff to design and build the plant. The motion is *DENIED* with respect to any asserted offsets, which are not covered by the statute of repose, and any claims concerning the parties' agreements and interactions after the plant's design and construction were completed.

### BACKGROUND

The Court treats the following facts as undisputed unless otherwise noted:

#### A. Ancient History

On February 5, 1971, Stone & Webster, a Massachusetts corporation, entered into an agreement (the "1971 Agreement") with Duquesne and the other defendants to "act as Engineer–Constructor for the engineering, design, construction and installation" of Beaver Valley Power Station Unit No. 1 ("BVPS 1"), a nuclear power plant in Shippingport Borough, Pennsylvania. (1971 Agreement at 1.)[1] Under the terms of the contract, Duquesne, based in Pennsylvania, was to co-own the plant with defendants Pennsylvania Power Company, also a Pennsylvania corporation, and Ohio Edison Company, an Ohio corporation, and was to act as agent for these companies "with respect to all matters concerning the execution, administration and enforcement of [the] Agreement." (*Id.*)

Construction of BVPS 1 was substantially completed by January 22, 1976, and Duquesne began commercial operation of the plant later that year. In 1978, the parties entered into a Continuing Services Agreement (the "1978 Agreement"), subsequently extended and amended, pursuant to which Stone & Webster promised to

---

1. Although the agreement was signed in 1971, it was made effective as of November 1, 1967, the date that Stone & Webster's work on the power plant actually commenced. (1971 Agreement at 1.)

provide additional consulting ("Part A") and engineering ("Part B") services during the course of the plant's operation. (1978 Agreement at 1–6.) With regard to the Part A consulting services, Stone & Webster limited its liability for defects as follows:

> In the event such consulting services prove to be faulty or defective for any reason, we agree to redo such services at no charge to you and the foregoing shall constitute our sole liability with respect to the accuracy or completeness of the proposed services or reports or the activities involved in their preparation, and in no event shall we be liable for property damage or personal injury to you, your employees or third parties, or for consequential or special loss or damage, whether attributable to our negligence or otherwise....

(*Id.* at 1.) [2]

In late 1978, Stone & Webster informed Duquesne that overstress conditions existed in at least one of the plant's large-bore piping systems,[3] the fabrication and installation of which Stone & Webster had supervised. Duquesne reported the problem to the Nuclear Regulatory Commission ("NRC"), which initiated an investigation. After reanalyzing the systems, Stone & Webster concluded that they were not overstressed and that the confusion had resulted from discrepancies between two different computer programs used to analyze the piping. Finding that the original stress analysis program used by Stone & Webster employed an outdated methodology, the NRC, in March 1979, issued an Order To Show Cause why BVPS 1 should not be shut down pending full reanalysis of the affected piping systems with the newer computer program. According to Duquesne, before issuing the order, the NRC

had given Stone & Webster an opportunity to demonstrate the adequacy of the original piping system design, which Stone & Webster was unable to do in part because it could not reproduce accurate as-built records of BVPS 1's piping systems. Duquesne immediately shut down the plant. Within the year, the NRC also issued three Inspection and Enforcement Bulletins requiring nuclear plant licensees to undertake certain inspections and revisions of their safety-related piping systems.

BVPS 1 remained closed for a number of months while Stone & Webster and other engineers and consultants investigated the piping systems at the plant, forcing Duquesne to purchase replacement power for that time period at a cost in the tens of millions of dollars. Although the plant eventually reopened, the investigation and remedial work on the piping systems took more than two years to complete.

In December 1981, Duquesne presented to Stone & Webster an oral settlement demand in the amount of $40,000,000 for the costs and losses allegedly incurred as a result of Stone & Webster's faulty design and construction of BVPS 1 and of its conduct thereafter. Anticipating litigation, the parties entered into a Standstill Agreement effective February 9, 1982 (the "1982 Standstill Agreement"), under which "the running of any statute of limitations, which had not already run by [the agreement's effective date], with respect to any possible claims which [defendants] may have [had] against Stone & Webster relating to BVPS 1 [would] be tolled" until termination of the agreement. (1982 Standstill Agreement ¶ 2.)[4] Stone & Webster also agreed that, "in defending any suit which may [have been] filed by [defendants] based on

---

2. Stone & Webster also limited its liability for defects with regard to the Part B engineering services. (1978 Agreement at 11–12.)

3. Large-bore piping is defined as piping measuring more than two inches in diameter, (Defs.' Mem. Opp'n Pl.'s Mot.Summ.J. at 4);

in contrast, small-bore piping measures two inches or less in diameter, (Compl. at 4).

4. Defendants made a reciprocal promise regarding possible claims against them by Stone & Webster. (1982 Standstill Agreement ¶ 3.)

[defendants'] possible claims, it [would] not plead or rely upon any time-related defense" based upon time that had run during the pendency of the agreement. (*Id.*) Duquesne listed defendants' possible claims as including, but not limited to, claims

> seek[ing] recovery of replacement power costs, engineering costs, design costs, analysis costs, construction costs, document preparation costs, administrative and overhead costs, attorneys' fees and other damages incurred in connection with, as a result of, or otherwise relating to the shutdown of BVPS 1 which began in March, 1979 and the circumstances contributing thereto or flowing therefrom.

(*Id.* at ¶ 1.)[5]

## B. *The Present Dispute*

On March 21, 1991, the parties entered the first of another series of continuing service agreements. The agreement, effective April 1, 1991 (the "1991 Agreement"), and amended in June 1997, provided that Stone & Webster would perform engineering and technical services at the plant pursuant to purchase orders issued by Duquesne.

During the summer of 1996, Duquesne's own engineers discovered that some of BVPS 1's small-bore piping appeared to be improperly supported. Consequently, on April 1, 1997, Duquesne issued a purchase order in the amount of $150,000 for review and analysis of the support design for the plant's small-bore piping system. Based upon its review, Stone & Webster concluded in July 1997 that some of the small-bore pipe supports did not appear to meet the "License Design Basis" set forth in the relevant regulations. (Letter from Friedrich W. Finger, Stone & Webster's Vice

President and Manager of Duquesne Projects, to Sushil C. Jain, Duquesne's Vice President of Nuclear Services, of 7/2/97, at 1.) The company indicated that further analysis was necessary and promised to continue working with Duquesne to upgrade the supports. (*Id.* at 2.) In order to allow its own and Stone & Webster's engineers to evaluate the supports, Duquesne shut down the plant later that month. BVPS 1 resumed operations in August 1997 and shut down again from October to December of that year for routine refueling and further analysis of the supports.

Duquesne issued two additional purchase orders, on October 14, 1997, and October 16, 1997, in the amounts of $380,-000 and $250,000 respectively, for services concerning the small-bore piping issue at the plant. Stone & Webster completed the work specified by those orders and submitted a series of invoices for the work. Duquesne did not pay these invoices. Rather, in a letter to Edward J. Walsh, Stone & Webster's Power Group President, dated December 19, 1997, James E. Cross, Duquesne's Senior Vice President and Chief Nuclear Officer, stated that Duquesne "[did] not intend to pay [the small-bore piping] invoices or any other invoices for work conducted by [Stone & Webster] in connection with the design basis concerns associated with the small bore safety related piping supports." (Letter from Cross to Walsh of 12/19/97, at 1.)

According to Cross, Duquesne's refusal to pay was based on its belief that Stone & Webster is responsible for Duquesne's multi-million dollar costs and losses associated with the small-bore piping support condition. (*Id.* at 2–3.) Cross maintained:

> In connection with the original engineering, design, construction and installation

---

5. In a proposed draft of the 1982 Standstill Agreement by Stone & Webster, it had suggested limiting the toll for claims against it by defendants to those claims "relating to the outage of [BVPS 1] arising out of the [NRC's March 1979] order to show cause." (Defs.' Exs. Opp'n Pl.'s Mot.Summ.J.Ex. 12 ¶ 1.)

Based upon defendants' objection, this language was rejected in the final draft in favor of broader phrasing: "any possible claims which [the parties] may have against each other relating to BVPS 1." (1982 Standstill Agreement ¶ 1.)

of [BVPS 1], [Stone & Webster] promised that its services would conform to the highest professional standards, which they clearly did not. [Duquesne] is entitled to assert claims at this time arising out of deficiencies in [Stone & Webster's] original work because of the Agreement, dated as of February 9, 1982, between [the parties], which has the effect of tolling any statute of limitations or other time-related defenses.

(*Id.* at 2.) Cross also alleged that, as early as 1978, Stone & Webster knew or should have known of the defects in the small-bore piping systems and that it failed to alert Duquesne to the problem at the time. (*Id.* at 2–3.) Since receiving the letter, Stone & Webster has continued to perform work on BVPS 1's small-bore piping systems under the October 1997 purchase orders. To date, its invoices remain unpaid.

## C. *The Lawsuit*

This lawsuit followed. In April 1998, Stone & Webster filed a complaint in this Court seeking a judicial declaration pursuant to 28 U.S.C. § 2201(a) that Pennsylvania's twelve-year construction statute of repose, 42 Pa.Cons.Stat. § 5536, precludes any offset of the invoices or any affirmative claims by Duquesne stemming from the 1971 Agreement pertaining to BVPS 1's original design and construction.[6] The statute of repose provides, in pertinent part:

(a) ... [A] civil action or proceeding brought against any person lawfully performing or furnishing the design, planning, supervision or observation of construction, or construction of any improvement to real property must be commenced within 12 years after completion of construction of such improvement to recover damages for:

(1) Any deficiency in the design, planning, supervision, or observation of construction or construction of the improvement.

42 Pa.Cons.Stat. § 5536(a)(1).[7]

In response to plaintiff's suit, Duquesne maintained that it is entitled to offset the amount due under the outstanding invoices, and asserted counterclaims for breach of the 1971 and 1978 Agreements, breach of express warranty with regard to the 1971 Agreement, breach of implied warranty with regard to both the 1971 and 1978 Agreements, misrepresentation, and negligence. Duquesne does not allege any defects in Stone & Webster's small-bore piping work pursuant to the 1997 purchase orders or dispute the amount of money that is owed under the invoices.

After an unsuccessful attempt at mediation in February 1999, plaintiff now moves for summary judgment on the legal issue of the effect of 42 Pa.Cons.Stat. § 5536 on defendants' asserted offset and counterclaims. Specifically, Stone & Webster argues that the tolling provision of the parties' 1982 Standstill Agreement does not

---

6. The complaint also seeks a declaratory judgment that plaintiff has fully performed all of its obligations under the 1971 Agreement. In August 1999, the Court allowed plaintiff to amend its complaint to include two additional counts: one for breach of contract to recover over $1,200,000 allegedly due under the outstanding invoices for purchase orders made pursuant to the 1991 Agreement (as amended in 1997), and one for violation of Mass.Gen.L. ch. 93A, § 11.

7. Section 5536 became effective on June 27, 1978. The version of Pennsylvania's construction statute of repose that governed at the time the parties entered the 1971 Agreement and at the time of the plant's completion

provided: "No action ... to recover damages ... shall be brought against any person lawfully performing or furnishing the design, planning, supervision or observation of construction, or construction of such improvement more than twelve years after completion of such an improvement." Act of Dec. 22, 1965, P.L. 1183, § 1, 12 P.S. § 65.1. The parties agree that no substantial differences exist between the old and the new versions for purposes of this motion. *Cf. Vargo v. Koppers Co.*, 552 Pa. 371, 715 A.2d 423, 425–26 (1998) (discussing cases involving both versions to support the proposition that the construction statute is and always has been a statute of repose rather than a statute of limitation).

by its terms apply to the statute of repose and that, even if it does, statutes of repose like § 5536 are nonwaivable even by express agreement under Pennsylvania law. Plaintiff also contends that Pennsylvania's construction statute of repose is not subject to judicial extension in cases of fraud or otherwise and that, in any event, defendants have not presented any evidence of fraud by Stone & Webster to date. At a hearing before this Court on June 28, 1999, the Court denied defendants' motion for a continuance to take discovery and enjoined the parties from conducting further discovery into the original construction project.

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Because the parties have agreed that Pennsylvania law governs this dispute, (1971 Agreement at 10), I apply that law to the issues raised by plaintiff's motion, *see, e.g., Steinke v. Sungard Fin. Sys., Inc.*, 121 F.3d 763, 769 (1st Cir.1997) (honoring, absent a "compelling reason to do otherwise, ... the parties' choice of law on all counts upon which they agree"); *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 375 (1st Cir.1991) ("Where ... the parties have agreed about what law governs, a federal court sitting in diversity is free ... to forgo independent analysis and accept the parties' agreement.").

## DISCUSSION

### A. *Summary Judgment Standard*

A motion for summary judgment must be allowed if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmov-

ing party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 37 (1st Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a [reasonable] jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505) (citations and footnote in *Anderson* omitted). The court must "view the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

Summary judgment "may be particularly appropriate with regard to statute of limitations defenses" and other time-bar issues where, as here, the parties' dispute centers not on the essential facts, but rather on the legal conclusions compelled by those facts under the prevailing law. *Hays v. Mobil Oil Corp.*, 736 F.Supp. 387, 396 n. 7 (D.Mass.1990) (citing *Fidler v. Eastman Kodak Co.*, 714 F.2d 192, 198 (1st Cir.1983)), *aff'd in part and vacated in part*, 930 F.2d 96 (1st Cir.1991).

### B. *The Claims Affected by Pennsylvania's Construction Statute of Repose*

Before proceeding to the merits of plaintiff's argument that 42 Pa.Cons.Stat. § 5536 [8] bars defendants' position and per-

---

**8.** Section 5536 provides in full:

(a) Except as provided in subsection (b), a civil action or proceeding brought against

mits no exception even in cases of express waiver or fraud, it is important to be clear about which of defendants' claims are subject to the statute in the first place.

### 1. Offsets

■ By its terms, § 5536 cuts off "action[s] or proceeding[s]," 42 Pa.Cons.Stat. § 5536(a), a phrase that the Pennsylvania courts have consistently interpreted to mean "causes of action," *see, e.g., Vargo v. Koppers Co.,* 552 Pa. 371, 715 A.2d 423, 425–26 (1998) (noting that the statute "eliminates a plaintiff's cause of action," and collecting cases); *Noll v. Harrisburg Area YMCA,* 537 Pa. 274, 643 A.2d 81, 84 (1994); *Mitchell v. United Elevator Co.,* 290 Pa.Super. 476, 434 A.2d 1243, 1248 (1981) (concluding that the statute "completely abolishes and eliminates the cause of action itself" (interpreting, *inter alia, Misitis v. Steel City Piping Co.,* 441 Pa. 339, 272 A.2d 883, 885 (1971))); *see also Luzadder v. Despatch Oven Co.,* 834 F.2d 355, 358 (3d. Cir.1987) (noting that § 5536 "bars *actions* not brought within twelve years of the making of the improvement to real property" (emphasis added)). Therefore, although the statute may wipe out some of defendants' affirmative claims against Stone & Webster, it simply does not apply to any potential offsets against the invoices, which were asserted as a defense to plaintiff's suit.

### 2. Affirmative Claims

■ Most of Duquesne's affirmative claims are not covered by the statute because they arise out of events that are unrelated to the original design/construction of the plant in 1971. A claim must meet three requirements to be covered by the statute: (1) it must pertain to a real estate improvement; (2) more than 12 years must have elapsed between the completion of the improvements and the injury; and (3) the activity of the moving party must be within the class that is protected by the statute. *See McConnaughey v. Building Components, Inc.,* 536 Pa. 95, 637 A.2d 1331, 1333 (1994). The second requirement is central to this case. Because the statute runs from the date of completion of the project, conduct occurring after completion of the project does not fall under the statute.

### C. Express Waiver[9]

■ The key question is whether the statute of repose is subject to express

any person lawfully performing or furnishing the design, planning, supervision or observation of construction, or construction of any improvement to real property must be commenced within 12 years after completion of construction of such improvement to recover damages for:
(1) Any deficiency in the design, planning, supervision or observation of construction or construction of the improvement
(2) Injury to property, real or person, arising out of any such deficiency.
(3) Injury to the person or for wrongful death arising out of any such deficiency.
(4) Contribution or indemnity for damages sustained on account of any injury mentioned in paragraph (2) or (3).
(b) Exceptions:
(1) If an injury or wrongful death shall occur more than ten and within 12 years after completion of the improvement, a civil action or proceeding within the scope of subsection (a) may be commenced within the time otherwise limited by this subchapter, but not later than 14 years after completion of construction of such improvement.
(2) The limitation prescribed by subsection (a) shall not be asserted by way of defense by any person in actual possession or control, as owner, tenant or otherwise, of such an improvement at the time any deficiency in such an improvement constitutes the proximate cause of the injury or wrongful death for which it is proposed to commence an action or proceeding.
(c) No extension of limitations. This section shall not extend the period within which any civil action or proceeding may be commenced under any provision of law.

9. Because the ultimate conclusion is that the statute of repose is nonwaivable, I assume without deciding here that the parties' standstill agreement actually does, by its terms, waive the statute of repose defense. Du-

waiver by written agreement of the parties. Although there is no Pennsylvania case directly on point, several courts have dealt with the issue in the procedural context—whether a failure to raise the defense at a certain point in the proceedings represents a waiver—and have all concluded that the statute of repose is nonwaivable. *See Vargo,* 715 A.2d at 425 n. 1 (holding that "unlike a statute of limitations, a statute of repose is not waived if not pled as an affirmative defense, and may be raised for the first time in a motion for nonsuit, directed verdict, or judgment n.o.v."); *Mitchell,* 434 A.2d at 1249 (holding that the statute of repose is "a non-waivable statute"); *Fetterhoff v. Fetterhoff,* 354 Pa.Super. 438, 512 A.2d 30, 31 (1986) (same); *Sharon Steel Corp. v. Workmen's Compensation Appeal Bd.,* 670 A.2d 1194 (Pa.Cmwlth.1996) (holding that statutes of repose are "jurisdictional" and an agreement to waive the statute of repose was unenforceable where the express waiver was entered after the repose period had already expired).

Defendants' strongest point here is § 5501(c), which provides: *"Equitable Matters*—Nothing in this Chapter shall modify the principles of waiver, laches and estoppel and similar principles heretofore applicable in equitable matters." They argue that this section permits the parties to waive the statute of repose. This section does not give Duquesne bingo because it appears to apply only to "equitable matters." *See* 1 Pa.Cons.Stat. § 1924 (stating that headings prefixed to articles, chapters, etc. of a statute may aid construction). Here, the counterclaims are requesting compensatory damages only. Furthermore, provisions of a statute are supposed to be read in such a way that all of them are given effect. *See id.* § 1932

(statutes or parts of statutes in pari materia are to be construed together). Section § 5501(a) sets forth a general rule that the only permissible modification of the statute of repose by written agreement of the parties is the *shortening* of the repose period.[10]

It is true that courts in other jurisdiction have permitted such a waiver of the statute of repose. *See ESI Montgomery County, Inc. v. Montenay Int'l Corp.,* 899 F.Supp. 1061, 1066 (S.D.N.Y.1995) (upholding an express waiver of period of repose in a federal securities action); *First Interstate Bank of Denver v. Central Bank & Trust Co.,* 937 P.2d 855, 860 (Colo.App. 1997) (upholding written agreement tolling statute of repose pending a final adjudication on federal claims); *One North McDowell Assoc. v. McDowell Dev. Co.,* 98 N.C.App. 125, 389 S.E.2d 834, 836 (1990) (holding under North Carolina law that a construction statute of repose is subject to an express waiver by written agreement extending statute of repose for two years to see if corrective measures were successful). However, no case addressed an open-ended written waiver of the statute of repose which purported to extend the limitations period forever.

While the issue is not free from doubt, the direction the Pennsylvania courts seem to be heading in, especially in light of the strong distinction they are now making between the statutes of limitation and repose, is to find the statute of repose non-waivable. A court exercising diversity jurisdiction should not push state law beyond its current confines. *See, e.g., Siedle v. Putnam Inv., Inc.,* 147 F.3d 7, 11 (1st Cir.1998). Contrary to defendants' assertions, Pennsylvania law recognizes that the

quesne has the better argument on this issue anyway, since the phrase "all time-related defenses" seems broad enough to have included the statute of repose.

**10.** Section 5501(a) provides:
(a) General Rule—An action, proceeding or appeal must be commenced within a time

specified in or pursuant to this chapter unless, in the case of a civil action or proceeding, a different time is provided by this title or another statute or a shorter time which is not manifestly unreasonable is prescribed by written agreement...

statute does serve a salutary purpose beyond protecting the engineers who lobbied for it. *See Berwick Indus. v. Workmen's Compensation Appeal Bd.*, 537 Pa. 326, 643 A.2d 1066, 1070 (1994) (extolling statutes of repose as "favored in the law" because they "promote repose by giving security and stability to human affairs").

### D. *Fraud*[11]

Defendants argue that the statute of repose should be equitably tolled because in 1978 and 1979 plaintiff fraudulently concealed its negligence with respect to the small-bore piping systems installed in BVPS 1. Because the fraud exception is part of Chapter 55 of the Pennsylvania statute, the same chapter that contains the statute of repose, defendants argue that it extends the time period in the statute of repose.

Plaintiff argues that engrafting an exception to the statute of repose for fraudulent concealment would contradict the statute's plain language, as well as its underlying policies. It points to other cases declining to apply the doctrine of equitable tolling to statutes of repose. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 362, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (applying federal securities law); *First United Methodist Church of Hyattsville v. United States Gypsum Co.*, 882 F.2d 862, 865 (4th Cir. 1989) (applying Maryland law).

While there is no case on point applying a fraud exception to a construction statute of repose in litigation by a private party, Pennsylvania courts have held that other statutes of repose are subject to equitable tolling. *See, e.g., Sharon Steel Corp.*, 670 A.2d at 1200 (holding that doctrine of equitable estoppel may toll the operation of the workmen's compensation statute of re-

pose); *Goll v. Insurance Co. of N. Am.*, 417 Pa.Super. 46, 611 A.2d 1255 (1992) (holding same with respect to a No Fault Statute of Repose). Accordingly, reading the Pennsylvania tea leaves suggests that the doctrine of equitable tolling will apply to the Pennsylvania Construction Statute of Repose.

The Court need not definitively resolve this question because Duquesne has not made sufficient allegations of fraud or its equivalent, like fraudulent concealment, to get past the pleading hurdle. Indeed, at oral argument, and in briefing Duquesne has conceded it has no evidence of fraud, and has not pled it as an affirmative defense. Duquesne does allege as a counterclaim negligent or reckless misrepresentations regarding the small-bore piping systems (Count III), but the general allegations are insufficient to state a claim for fraud pursuant to Fed.R.Civ.P. 9(b). If, after discovery, there is evidence of fraudulent concealment in 1978 and 1979, the issue may be pressed full-bore ahead.

### *ORDER*

Plaintiff's motion for summary judgment (Docket No. 30) is *ALLOWED* with respect to those counterclaims (Count I, Count IV, Count V (in part), and Count VI (in part)) relating to defects in the original design, engineering and construction of the piping systems at BVPS1.

---

11. Section 5504 provides:
    (a) Except as provided in section 1722(c) (relating to time limitations) or in subsection (b) of this section, the time limited by this chapter shall not be extended by order, rule or otherwise.

    (b) The time limited by this chapter may be extended to relieve fraud or its equivalent, but there shall be no extension of time as a matter of indulgence or with respect to any criminal proceeding.